BETTY WITHERELL, Appellee, v. J. I. WEIMER *et al.*, Appellants.

*Opinion filed February 20, 1981.—Modified on denial of rehearing June 17, 1981.*

Lyle W. Allen, Roger R. Clayton, and David R. Sinn, of Heyl, Royster, Voelker & Allen, of Peoria, for appellants J. I. Weimer and R. K. Taubert.

Baker & McKenzie, of Chicago (Francis D. Morrissey, Thomas F. Tobin, and John T. Rank, of counsel), for appellant Ortho Pharmaceutical Corporation.

James L. Hafele, of Peoria, for appellee.

MR. JUSTICE UNDERWOOD delivered the opinion of the court:

Plaintiff, Betty Witherell, filed a personal injury action in the Tazewell County circuit court on January 4, 1978, against Drs. J. I. Weimer and R. K. Taubert, and Ortho Pharmaceutical Corporation (Ortho). She alleged that severe injuries to her legs were the result of the negligent conduct of the doctors and as to Ortho alleged negligence, strict product liability, and breach of warranty. The pretrial motions of all defendants to dismiss and for judgment under section 48(e) of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 48(e)) were allowed on the grounds that plaintiff had failed to bring suit within the time limits allowed by the applicable statutes of limitation. The appellate court reversed and remanded, holding a question of fact existed as to the time at which the statutes of limitation commenced to run. (77 Ill. App. 3d 582.) We allowed and consolidated the separate petitions for leave to appeal of the defendant doctors and Ortho.

A summary of the material considered by the parties and the court in its ruling on the motions, including the allegations of plaintiff's complaint, the contents of her affidavit, and her answers to interrogatories, is necessary. They indicate that in 1966 Dr. Weimer prescribed Ortho-Novum, a birth control pill manufactured by defendant

Ortho, for plaintiff and she began taking it. Shortly there-
after she commenced to have pain and spasms in her left
leg, which became swollen and "could hardly bear weight
on it." The pain was so great that plaintiff had to put her
left leg on a chair and "scoot" the chair to get around the
house. She consulted Dr. Weimer about the condition in
March of the following year. His associate, Dr. Taubert,
hospitalized her and told her he thought she had a blood
clot in her leg. Dr. Weimer, however, advised plaintiff that
she had a muscle condition and would have to learn to
live with it.

Although released from the hospital in April, plain-
tiff continued to have the pain and spasms in her leg
which progressively worsened. The problems persisted
through 1971, with Dr. Weimer reiterating that they were
caused by a muscle condition and prescribing leg massage,
walking, and support hose and directing her to ignore the
pain. The condition was, in her words, "excruciatingly
painful," but she tried to ignore it, thinking it was the
muscle condition diagnosed by Dr. Weimer. Sometimes
"the pain was so bad that plaintiff had to crawl back and
forth to the bathroom."

In July 1972, plaintiff was again hospitalized by Drs.
Weimer and Taubert. Plaintiff told Dr. Weimer that she
had heard from other women that birth control pills
could cause blood clots. "Dr. Weimer laughed and said
that she should not worry that the pills did not cause
bloodclots and that they were safe to take and that they
would not harm her in any way." Plaintiff discontinued
her use of the pill for a month in 1973 at the urging of her
mother, but Dr. Weimer reassured her that the problem
in her legs was not caused by the pills, and she resumed
taking them. The condition remained relatively the same
thereafter, and plaintiff continued to complain to the
doctor, who kept reassuring plaintiff that the problem
with her legs was a muscle condition and that she would

just have to live with it. He told her that the blood clot for which she had been treated previously was gone, that she did not have blood clots in her legs, and that the trouble with her legs was strictly the muscle condition. In May of 1976, plaintiff was admitted to Pekin Memorial Hospital for the condition in her legs. Again, Dr. Weimer told her it was a muscle condition, and he prescribed whirlpool baths and walking. Plaintiff asked Dr. Weimer for a veinogram, of which plaintiff had just recently heard. The doctor, according to plaintiff, said, "Now there's nothing wrong with the veins in your legs," as he patted her on the leg.

Thereafter plaintiff apparently discharged Dr. Weimer and Dr. Taubert, left the hospital and consulted Dr. Juco, a Peoria physician, who had her admitted to a Peoria hospital. After performing a veinogram on her legs, Dr. Juco told plaintiff she had bilateral thrombosis, that some of the veins were occluded from the old blood clots and that the condition of her legs was serious. About three months later plaintiff, without benefit of counsel, filed what is described as a "letter complaint" against Drs. Weimer and Taubert in the circuit court of Peoria County. That complaint was later dismissed without prejudice on the court's own motion and the instant suit filed. Plaintiff's bill of particulars in the current suit describes her then current condition as having "extensive deep vein thrombosis in both lower extremities, with considerable recannulization. Plaintiff's legs are always in pain. The only variation is that the pain goes from tolerable to excruciating. Her legs must be elevated at all times. She uses a cane for walking, except when she is in a wheelchair. If plaintiff goes out of her home she must do so in a wheelchair. She cannot play the piano, she cannot dance, she can engage in no sporting events such as fishing, she cannot do her housework, her condition interferes with sexual intercourse between her and her husband, and in

numerous other aspects interferes with the daily enjoyment of her life."

Excerpts from the Ortho-Novum product information apparently contained in the physician's desk reference book indicate that "A statistically significant association has been demonstrated between use of oral contraceptives and the following serious adverse reactions: Thrombophlebitis ***." It also states: "The physician should be alert to the earliest manifestations of thrombotic and thromboembotic disorders, thrombophlebitis ***. Should any of these occur or be suspected, the drug should be discontinued immediately."

Accompanying the motions for judgment were affidavits of Drs. Weimer and Taubert, from two other doctors who had examined plaintiff, and from Miriam Nafziger, a hospital nurse. Dr. Weimer stated plaintiff had been a patient since 1963, had been hospitalized in 1967 "with a diagnosis of thrombophlebitis of the left calf," and again in 1972 for "the treatment of thrombophlebitis of the right leg in the calf area." On both occasions plaintiff's condition was fully explained to her. He also hospitalized plaintiff in May 1976 for leg problems which were diagnosed as "possible neuritis and myositis" unrelated to her earlier thrombophlebitis. Dr. Taubert's affidavit was substantially similar, both doctors indicating plaintiff initially gave them a history of pain and swelling in her left leg during the preceding three or four years. In a rebutting affidavit, plaintiff stated that she was told by the defendant doctors in 1967 and 1972 that she had blood clots in her legs; she denied that Dr. Weimer or Dr. Taubert ever told her she had thrombophlebitis and stated the first time she ever heard the word "thrombophlebitis" was in 1976 when she was examined by Dr. Juco.

Dr. Benito M. Camacho's affidavit stated he saw plaintiff in March and April 1977 as a result of her referral to him by Dr. Juco; that she gave him a history of deep

vein thrombosis in 1967 when she was taking birth control pills which were "thought to be the inciting factor" for the thrombosis. Attached to the affidavit were copies of his office records containing the notes of the March and April interviews.

In his affidavit Dr. Francis Rafool stated he had admitted plaintiff to Methodist Hospital in Peoria in 1969, at which time plaintiff had told him "she had had swelling of her left leg following a thrombophlebitis about two years prior to June 25, 1969, and that on that date of June 25, 1969, she was on birth control pills."

Nurse Nafziger stated in her affidavit that she cared for plaintiff while the latter was hospitalized in May 1976; at that time plaintiff told affiant that plaintiff had had blood clots and pain in her legs for the past nine years.

Plaintiff's rebutting affidavit denies telling Dr. Camacho what his medical history notes indicated she had told him, and denies telling either Dr. Rafool or Nurse Nafziger that she had thrombophlebitis.

Plaintiff's allegations of negligence on the part of Drs. Weimer and Taubert are predicated on their failure to diagnose her condition of thrombophlebitis, failing to treat that condition properly, and their continuing negligence in continuing to prescribe birth control pills for her even though those pills could be causing her thrombophlebitis. It is alleged that these acts of negligence continued up to the time plaintiff discharged the doctors in May 1976. The negligence claim against Ortho is predicated on allegations that proper warnings were not given regarding a possible relationship between Ortho-Novum and thrombophlebitis. The strict liability and breach of warranty claims are based, respectively, on charges that Ortho-Novum was not a reasonably safe product and not of merchantable quality.

The question before us is the time at which plaintiff's cause of action accrued for purposes of the statute of limitations and whether any acts of defendants have tolled

the running of the statute as to them.

The statute of limitations governing plaintiff's action against the doctors is section 21.1 of the Limitations Act:

> "No action for damages for injury or death against any physician or hospital duly licensed under the laws of this State, whether based upon tort, or breach of contract, or otherwise, arising out of patient care shall be brought more than 2 years after the date on which the claimant knew, or through the use of reasonable diligence should have known, or received notice in writing of the existence of the injury or death for which damages are sought in the action, whichever of such date occurs first, but in no event shall such action be brought more than 4 years after the date on which occurred the act or omission or occurrence alleged in such action to have been the cause of such injury or death." (Ill. Rev. Stat. 1977, ch. 83, par. 22.1.)

Section 14 of that act is applicable to plaintiff's tort claims against defendant Ortho:

> "Actions for damages for an injury to the person, or for false imprisonment, or malicious prosecution, or for a statutory penalty, or for abduction, or for seduction, or for criminal conversation, shall be commenced within two years next after the cause of action accrued." (Ill. Rev. Stat. 1977, ch. 83, par. 15.)

Section 2—725 of the Uniform Commercial Code governs plaintiff's breach of warranty claim. It provides in pertinent part:

> "(1) An action for breach of any contract for sale must be commenced within 4 years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.
>
> (2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered." (Ill. Rev. Stat. 1977, ch.

26, pars. 2—725(1), (2).)

Also relevant to our decision is section 22 of the Limitations Act relating to fraudulent concealment:

> "If a person liable to an action fraudulently conceals the cause of such action from the knowledge of the person entitled thereto, the action may be commenced at any time within five years after the person entitled to bring the same discovers that he has such cause of action, and not afterwards." Ill. Rev. Stat. 1977, ch. 83, par. 23.

Medical malpractice litigation has been the subject of much legislative and judicial concern in recent years. (See, e.g., *Anderson v. Wagner* (1979), 79 Ill. 2d 295, *appeal dismissed sub nom. Woodward v. Burnham City Hospital* (1980), 449 U.S. 807, 66 L. Ed. 2d 11, 101 S. Ct. 54.) Application of the so-called "discovery rule" in medical malpractice cases became a major concern since the cause of action did not "accrue" in the sense of triggering the statute of limitations until the plaintiff learned of his injury or should have learned of it. (*Anderson v. Wagner* (1979), 79 Ill. 2d 295, 305.) Consequently, in those situations where the plaintiff neither knew nor had reason to know of the injury at the time it occurred, litigation could be commenced after expiration of the period ordinarily contemplated by the applicable statutes of limitation when computed from the time of occurrence of the complained-of conduct. As this court pointed out in *Anderson,* the General Assembly responded to what was considered to be a "medical malpractice insurance crisis" (79 Ill. 2d 295, 305), by amending section 21.1 of the limitations statute, earlier quoted, to provide that a personal injury or death action against a doctor or hospital must be brought within two years from the date when the injury is or should be known, and in no event more than four years from the date of the alleged misconduct.

The "discovery rule" was first announced by us in *Rozny v. Marnul* (1969), 43 Ill. 2d 54, which involved a

surveyor's error, and has been applied in a variety of situations: *Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418 (products liability); *Lipsey v. Michael Reese Hospital* (1970), 46 Ill. 2d 32 (medical malpractice); *Berry v. G. D. Searle & Co.* (1974), 56 Ill. 2d 548 (products liability); and *Tom Olesker's Exciting World of Fashion, Inc. v. Dun & Bradstreet, Inc.* (1975), 61 Ill. 2d 129 (defamation). It is entirely clear from the opinions in *Williams* and *Berry* that in a products liability tort case the statute of limitations runs from the time plaintiff knew or should have known of the injury and not from the time of sale of the product. It is equally clear from *Lipsey* that the same rule applies in medical malpractice cases. Because neither *Berry* nor *Lipsey* precisely defined the term "injury," the parties here and in a number of appellate court cases have differed in their interpretations. (Compare *Kaufman v. Taub* (1980), 87 Ill. App. 3d 134, with *Greenock v. Rush Presbyterian St. Luke's Medical Center* (1978), 65 Ill. App. 3d 266, and *Roper v. Markle* (1978), 59 Ill. App. 3d 706, with *Ilardi v. Spaccapaniccia* (1977), 53 Ill. App. 3d 933.) Where substantial intervals exist between the time at which a plaintiff should have known of the physical injury and the time at which he should have known that it was negligently caused, the definition of "injury" as including or excluding its wrongful causation becomes significant. Since plaintiff here has alleged that she did not know until May 1976 the nature of her true condition and that it had resulted from the negligence of the doctors in continuing to prescribe Ortho-Novum, plaintiff urges her suit filed less than two years thereafter is timely. It is suggested that our opinions have left unresolved the question whether the statute is triggered by plaintiff's discovery of the injury or not until discovery of the negligence where, as alleged here, knowledge of the injury substantially preceded knowledge of its cause.

The statute starts to run when a person knows or reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused. At that point the burden is upon the injured person to inquire further as to the existence of a cause of action. (*United States v. Kubrick* (1979), 444 U.S. 111, 62 L. Ed. 2d 259, 100 S. Ct. 352; *Urchel v. Holy Cross Hospital* (1980), 82 Ill. App. 3d 1050, 1052-53; *Gaudynski v. Corbett* (1980), 81 Ill. App. 3d 910, 913-14; *Ikenn v. Northwestern Memorial Hospital* (1979), 73 Ill. App. 3d 694, 699; *Greenock v. Rush Presbyterian St. Luke's Medical Center* (1978), 65 Ill. App. 3d 266.) In many, if not most, cases the time at which an injured party knows or reasonably should have known both of his injury and that it was wrongfully caused will be a disputed question to be resolved by the finder of fact. (*Lipsey.*) Where it is apparent from the undisputed facts, however, that only one conclusion can be drawn, the question becomes one for the court. *Berry.*

In the present case the plaintiff began to experience problems with her leg shortly after taking the birth control pill prescribed by the doctor and manufactured by defendant Ortho. She was hospitalized for this condition in 1967 and after her release asserts she experienced excruciating pain in that leg. She had great difficulty in simply moving about her home. The plaintiff was told by her mother and other women that the pill could cause blood clots, and she even voluntarily stopped taking the pill for a month. She was again hospitalized in 1972 for problems in her leg. While maintaining that no doctor told her prior to 1976 that she had thrombophlebitis, she stated in her affidavit that Dr. Taubert told her in 1967 and in 1972 that she had blood clots in her leg.

Given the severe difficulties plaintiff asserts she was having with her legs, the advice from her mother and others that the pill could cause blood clots, her statement

that Dr. Taubert told her in 1967 and 1972 that she was having blood clots in her legs but that Dr. Weimer was insisting the problems were muscular, it is, as in *Berry,* inconceivable to us that a reasonable person would not have realized, at least by the time of plaintiff's second hospitalization in 1972, that she may not have been receiving proper diagnosis and treatment. If Ortho was negligent in the warning it gave, if Ortho did break its warranty concerning the product, and if Ortho did place an unreasonably dangerous product in commerce, then any claim for injuries suffered thereby should have been brought within the time allowed after plaintiff knew or reasonably should have known that her injury resulted from actionable conduct by Ortho. That point was reached more than five years before the present action was filed, and plaintiff might well have acted within the statutory period had it not been for the advice she alleges was given her by the doctors. Ortho-Novum was a prescription drug available only when prescribed by the doctors, who, plaintiff says, continued to prescribe it. It is not alleged that in doing so they were acting as representatives of the manufacturer, nor is any issue raised as to other conduct by Ortho which would preclude it from raising the limitations defense. As was recently said by the Supreme Court in speaking of a similarly situated plaintiff in *Kubrick:*

"If he fails to bring suit because he is incompetently or mistakenly told that he does not have a case, we discern no sound reason for visiting the consequences of such error on the defendant by delaying the accrual of the claim until the plaintiff is otherwise informed or himself determines to bring suit, even though more than two years have passed from the plaintiff's discovery of the relevant facts about injury." (*United States v. Kubrick* (1979), 444 U.S. 111, 124, 62 L. Ed. 2d 259, 270, 100 S. Ct. 352, 360.)

In our judgment the trial court's action in dismissing the complaint as to Ortho was proper.

Completely different circumstances exist, however, as to the defendant doctors. We have held that plaintiff, in the factual context she alleges, should have been alerted to the fact that her condition was the result of actionable conduct by defendants. Her consideration of that contingency is manifested by her inquiry to the doctor regarding a connection between her leg problems and the pills, and her subsequent request that he perform a veinogram. Had it not been for the alleged constant reassurance by Dr. Weimer that it was a muscle condition and not Ortho-Novum which was causing her problems, and had he not persuaded her it was safe to resume taking it after she voluntarily quit, plaintiff's action would not have been so long delayed. Consequently, she now urges, the doctors should be precluded by the fraudulent concealment provisions of the earlier-quoted section 22 of the Limitations Act from raising the limitations issue.

We need not here consider whether section 22 is applicable to medical malpractice cases, a question left unresolved in *Anderson v. Wagner* (1979), 79 Ill. 2d 295, 322, nor whether the alleged conduct of the doctors comes within the scope of that statute. In our opinion, generally accepted principles of equitable estoppel prevent the defendant doctors from urging the limitations bar.

As was said by the Supreme Court in *Glus v. Brooklyn Eastern District Terminal* (1959), 359 U.S. 231, 232-33, 3 L. Ed. 2d 770, 772, 79 S. Ct. 760, 762: "To decide the case we need look no further than the maxim that no man may take advantage of his own wrong. Deeply rooted in our jurisprudence this principle has been applied in many diverse classes of cases by both law and equity courts and has frequently been employed to bar inequitable reliance on statutes of limitations." (See also *Dill v. Widman* (1952), 413 Ill. 448, 471-72; *Coke v. General Adjustment*

*Bureau, Inc.* (5th Cir. 1980), 616 F.2d 785, 790; *Bomba v. W. L. Belvidere, Inc.* (7th Cir. 1978), 579 F.2d 1067; Annot., 43 A.L.R.3d 429, 440 (1972).) The Pennsylvania Supreme Court, in defining an equitable estoppel which will preclude raising the statute of limitations, held it to include unintentional deception, and that " 'It is not the intention of the party estopped but the natural effect upon the other party which gives vitality to an estoppel'. 5 Williston, Contracts sec. 691 (3d ed. 1961)." (*Nesbitt v. Erie Coach Co.* (1964), 416 Pa. 89, 96, 204 A.2d 473, 477.) To the same effect is the statement of the Seventh Circuit Court of Appeals in *Bomba v. W. L. Belvidere, Inc.* (7th Cir. 1978), 579 F.2d 1067, 1071: "Moreover, it is not necessary that the defendant intentionally mislead or deceive the plaintiff, or even intend by its conduct to induce delay. [Citations.] Rather, all that is necessary for invocation of the doctrine of equitable estoppel is that the plaintiff reasonably rely on the defendant's conduct or representations in forbearing suit."

There is no real doubt, of course, that the relationship between a doctor and his patient is one in which the patient normally reposes a great deal of trust and confidence in the doctor, accepting his recommendations without question. The relationship is appropriately described in 61 Am. Jur. 2d *Physicians and Surgeons,* section 95, at 214 (1972):

> "The relation of physician and patient has its foundation on the theory that the former is learned, skilled, and experienced in those subjects about which the latter ordinarily knows little or nothing, but which are of the most vital importance and interest to him, since upon them may depend the health, or even life, of himself or family; therefore the patient must necessarily place great reliance, faith, and confidence in the professional word, advice, and acts of the physician."

Numerous cases characterize the relationship as a fiduciary one. See, *e.g.,* 61 Am. Jur. 2d *Physicians and Surgeons*

sec. 100 (1972); *Zeigler v. Illinois Trust & Savings Bank* (1910), 245 Ill. 180; *Fure v. Sherman Hospital* (1978), 64 Ill. App. 3d 259; *Stafford v. Shultz* (1954), 42 Cal. 2d 767, 270 P.2d 1; *Bowman v. McPheeters* (1947), 77 Cal. App. 2d 795, 176 P.2d 745; *Adams v. Ison* (Ky. 1952), 249 S.W.2d 791.

In the circumstances alleged to be present here, we believe that considerations of fundamental fairness require that the defendant doctors be held estopped by their conduct from now urging that plaintiff should have sooner complained against them for a condition they repeatedly assured her she did not have. Plaintiff, acting *pro se,* filed a "letter complaint" against the defendant doctors with the Peoria County circuit court shortly after terminating her relationship with them. The complaint now before us was filed within three months following dismissal without prejudice of the *pro se* action. We cannot say that plaintiff did not act within a reasonable time after she was informed of what she alleges to be her true condition. She is, in our judgment, entitled to an opportunity to prove the allegations upon which the estoppel and her cause of action are based.

The judgment of the appellate court is accordingly affirmed as to the defendant doctors and reversed as to defendant Ortho. The cause is remanded to the circuit court of Tazewell County for further proceedings consistent with this opinion.

*Affirmed in part and reversed in part and remanded.*

MR. JUSTICE SIMON took no part in the consideration or decision of this case.