**LIND–WALDOCK & COMPANY, Plaintiff,**

v.

**Glenn W. CAAN and Mary D. Caan, Defendants.**

No. 87 C 5099.

United States District Court, N.D. Illinois, E.D.

March 3, 1988.

**58**

Jeffrey Keck, Ham, Keck & Pawlan, Chicago, Ill., for plaintiff.

William H. Harbeck, Quarles & Brady, Milwaukee, Wis., Joel T. Pelz, Jenner & Block, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Lind–Waldock & Company ("Lind–Waldock") originally sued Glenn ("Glenn") and Mary ("Mary") Caan (collectively "Caans") in the Illinois state courts, claiming breach of contract and fraud in connection with losses Glenn suffered in 1980 as a trader on the Chicago Mercantile Exchange (the "Exchange"). Caans then properly removed that action to this District Court because diversity of citizenship existed between the parties. Caans have now moved for judgment under Fed.R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, their motion is granted and this action is dismissed.

### Facts [1]

In August 1979 Glenn leased a membership in Exchange's International Money Market (the "Market") from Thomas Bernstein ("Bernstein"). About the same time Glenn executed an account agreement with Lind–Waldock under which Lind–Waldock was to serve as the clearing broker for his

trading. In early March 1980 Glenn experienced heavy trading losses. As clearing broker Lind–Waldock was responsible for covering those losses, which it did to the tune of $385,000.

On March 20, 1980 both Caans executed a note to Lind–Waldock (the "Note"), binding themselves jointly to pay $385,000 plus 10% interest. As security for the Note, Mary mortgaged Wisconsin real estate she owned to Lind–Waldock.

Caans defaulted on the Note, and Lind–Waldock initiated foreclosure in a Wisconsin state court in July 1981, seeking both to obtain full recovery on the Note and to cause the mortgaged property to be sold for that purpose. In part the prayer for relief in Lind–Waldock's Complaint demanded:

> that the amount due to [Lind–Waldock] for principal, interest, costs and disbursements and attorney fees be adjudged and determined; that [Lind–Waldock] be paid the amount due on said note ... so far as the monies arising out of this sale and proceeds applicable thereto will pay same; that [Lind–Waldock] shall have judgment and execution against [Caans] for the amount of any deficiency....

While the foreclosure was pending Exchange sold Bernstein's membership, with the proceeds of $220,000 going to Lind–Waldock. Bernstein had sued unsuccessfully to prevent the sale (see *Bernstein v. Lind–Waldock & Co.*, 738 F.2d 179 (7th Cir.1984)). At this point he continues to seek recovery of the proceeds in state court (*Bernstein v. Lind–Waldock Co., Glenn W. Caan and Mary D. Caan*, No. 84 CH 8467, Cir.Ct. of Cook County).

On July 29, 1982 Caans and Lind–Waldock settled the foreclosure action by agreeing (1) that Caans owed Lind–Waldock $140,000 and (2) that part rather than all of the mortgaged property would be sold in the first instance, with the rest to be sold only if the first sale proceeds were insufficient to satisfy the agreed-upon obli-

---

1. Familiar Rule 56 principles impose on the party moving for summary judgment the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). No real factual disputes exist here, and this statement of facts merely draws from the parties' memoranda.

gation. They stipulated to findings of fact ("Findings") and conclusions of law ("Conclusions"), which were entered by the Wisconsin court the next day (Findings of Fact and Conclusions of Law, *Lind–Waldock & Co. v. Glenn W. Caan and Mary D. Caan and Milwaukee County*, No. 558–270 (Cir.Ct. Milwaukee County) (July 30, 1982)).

Several of the Findings and Conclusions are particularly relevant to this case. Finding ¶ 11 read:

> That there is now due and owing to [Lind–Waldock] the stipulated sum of $140,000, which has been determined by subtracting certain payments made by [Caans] and deducting as an offset the sum of $220,000 plus interest received by [Lind–Waldock], as a result of the sale of [Bernstein's Market membership].

Finding ¶ 11 went on to say:

> Bernstein and [Lind–Waldock] are presently engaged in litigation in other courts concerning the sale of said seat. Irrespective of the outcome of said litigation, this judgment shall stand.

Conclusion ¶ 1 specifically characterized the $140,000 amount as "the compromised, stipulated and agreed upon sum due and owing upon the aforesaid note...." Finally, Conclusion ¶ 7 said:

> That [Lind–Waldock] shall have judgment and execution against [Caans] for the amount of any deficiency that may remain after the sale of said real estate.

Pursuant to the settlement agreement (Finding ¶ 12) the mortgaged property was subdivided and the portion not containing Caans' home was sold in satisfaction of the $140,000 judgment. In material part the August 3, 1982 Judgment of Foreclosure read:

> That there is due to [Lind–Waldock] as of the 30th day of June, 1982, principal and interest through that date in the sum of $140,000.00 from [Caans].

> \*   \*   \*   \*   \*   \*

> That in the event there is a deficiency remaining after the sale of the real estate for the amount due and owing [Lind–Waldock], [Lind–Waldock] shall have judgment and execution against [Caans] for the amount of any such deficiency.

And the August 29, 1982 order confirming the Sheriff's sale specifically found:

> That the total amount due [Lind–Waldock] as of the date of confirmation of sale is One Hundred Fifty-eight Thousand Four Hundred Dollars ($158,400.00) [by reason of amounts appropriately added to the agreed-upon $140,000].

> \*   \*   \*   \*   \*   \*

> That there remains no deficiency due [Lind–Waldock] as the result of said foreclosure sale and that there will be no deficiency judgment in favor of [Lind–Waldock].

In November 1985 Glenn filed for bankruptcy in the Eastern District of Wisconsin. He included in his schedule of debts Bernstein's claim against him for sale of the Market membership. On March 17, 1986 the Bankruptcy Court discharged Glenn from all dischargeable debts, including that to Bernstein.

### Contentions of the Parties

Lind–Waldock says Caans still owe it $220,000 on a host of different theories:

1. under the March 20, 1980 Note (Count I);

2. under the March 20, 1980 settlement agreement (Count II);

3. under the August 1979 customer account agreement (Count III);

4. as a third-party beneficiary of the lease between Bernstein and Glenn (Count IV);

5. for fraud in inducing the August 1979 customer account agreement (Count V); and

6. for fraud in inducing the March 20, 1980 settlement agreement (Count VI).

Caans respond:

1. Their 1982 settlement of the foreclosure suit bars any action.

2. Glenn's 1985 discharge in bankruptcy also bars any action.

3. All fraud counts are barred by Illinois' five-year statute of limitations (Ill. Rev.Stat. ch. 110, ¶ 13–205).

Each defense will be examined in turn.

### Settlement of the Foreclosure Suit

■ Lind–Waldock's settlement of the foreclosure suit and the already-quoted language of Finding ¶ 11 clearly preclude Lind–Waldock's current non-fraud counts.[2] Even apart from the specific recognition that "this judgment shall stand" regardless of the outcome of the Bernstein claim, the settlement compromised Lind–Waldock's total claim against Caans. Parties are free to compromise their claims for any reason —and once they do so, their agreement is as binding as any other contract. There are of course circumstances (such as fraud) that enable a party to rescind its contract, but Lind–Waldock alleges no such circumstances here.

Apparently Lind–Waldock argues that because the earlier action was simply a foreclosure, Lind–Waldock agreed to forgo its claim for $220,000 only in the foreclosure proceeding and not in other venues.[3] But that contention is flatly belied by the record:

1. Lind–Waldock sued to recover on the Note, alleging an indebtedness of $355,000 (the total owed by Caans), and to foreclose its mortgage on a ten-acre tract and home that stood as security for the Note (D.Mem.Ex. 2 ¶ 11).

2. Lind–Waldock (having received payments on account from Caans plus the proceeds of sale of Bernstein's membership) then settled with Caans for $140,000, allowing the property securing the entire debt to be partitioned and just a portion of that property to be sold to satisfy the settlement amount.

3. Lind–Waldock then stipulated to the Findings, drafted by its counsel, that adjudged "the sum due and owing upon the [March 20, 1980] note and mortgage" to be $140,000 (Conclusion ¶ 1). Every document in the foreclosure action reconfirmed in several different ways that Lind–Waldock was suing, and recovered in full, on Caan's indebtedness to it.

4. Rather than preserving any rights under the Note if it eventually lost to Bernstein, Lind–Waldock *specifically* said the judgment would stand regardless of the outcome of that litigation.

Had Lind–Waldock intended to reserve its opportunity to pursue Caans if its prior recovery of $220,000 were later undone, it would have been a simple thing for it to say just that. Of course if Lind–Waldock's counsel *had* sought to include such a provision in the documents, Caans and their counsel in turn would have had the opportunity (and incentive) to negotiate a very different deal. Indeed, the natural thrust of the "this judgment shall stand" language would appear to be protective of Caans' limited liability. In sum, it makes no sense to view the resolution of the state lawsuit as anything less than a total settlement of all Lind–Waldock's contractual claims against Caans.[4]

---

**2.** More on the fraud counts later.

**3.** Lind–Waldock Mem. 12–13 says of the Findings and Conclusions and the litigants' stipulation pursuant to which they were entered:

> These documents and each of them relate solely and expressly to the foreclosure action and must be viewed solely in this context as a strict, statutory foreclosure proceeding in which the defendants' right, title and interest in real estate was foreclosed and, for the sole purpose of such foreclosure, the amount due to Lind–Waldock upon such foreclosure was liquidated.

That statement is disinguous at best. It betrays a total lack of understanding of the concept of "strict foreclosure" (obviously not involved in the Wisconsin action) and, more importantly, it is totally at odds with the provisions quoted in the text of this opinion that establish conclusively that Lind–Waldock was suing and in fact recovered on the *Note* itself and was not merely pursuing its lien rights in the real estate.

**4.** Because the foreclosure judgment explicitly extinguished any claim on the March 20 Note, Complaint Count I is barred by its own terms. And because the Note had been executed in settlement of debts arising out of the customer account agreement, Counts II and III must also fall. Finally, to the extent Lind–Waldock may be considered a third-party beneficiary of Glenn's lease from Bernstein, Lind–Waldock's rights merely duplicated its direct contract rights under the customer account agreement. In that context, the March 20 settlement agreement also subsumed those rights.

Caans have also asserted the foreclosure settlement precludes Lind–Waldock's claims under the doctrine of res judicata. Res judicata (more precisely, claim preclusion) bars relitigation of "matters which were litigated or which might have been litigated" in a prior cause of action (*In re Transocean Tender Offer Securities Litigation v. Esmark, Inc.*, 427 F.Supp. 1211, 1215 (N.D.Ill.1977)). Whether claim preclusion bars Lind–Waldock's claim thus depends on the permissible (rather than the actual) scope of the foreclosure action under Wisconsin law. But in this instance both claim preclusion and issue preclusion (which bars relitigation of matters actually litigated) are involved:

    1. Not only did Lind–Waldock have the right to, but it actually did, sue both on Caans' obligation and on the right to have the real estate sold and the proceeds applied in satisfaction of that obligation. All anyone need do to confirm that is to read the excerpts from the court documents quoted earlier in this opinion.

    2. Familiar doctrine teaches that a consent judgment (the result of the stipulated settlement between Lind–Waldock and Caans) partakes of the character of both (a) a contract and (b) a judicial determination and confirmation based on that contract.

It is clear that Lind–Waldock (1) sued to recover on the Note and on the entire obligation evidenced by the Note, (2) compromised that claim and (3) forwent foreclosure on a portion of its security, all in the context of the Wisconsin action. Viewed from its contractual aspect, the settlement bars Lind–Waldock from taking a second bite at the same apple. And viewed as judicial determinations, the judgment in foreclosure and the August 29, 1982 order confirming both the sale and the full satisfaction of all Caans' indebtedness to Lind–Waldock block relitigation of either the amount of that indebtedness or the absence of full satisfaction, in every sense of the term res judicata—both claim preclusion and issue preclusion.

■ Lind–Waldock's fraud claims also succumb because of the foreclosure litigation and settlement, although for slightly different reasons. It is familiar ground that the elements of fraud are (*Soules v. General Motors Corp.*, 79 Ill.2d 282, 286, 37 Ill.Dec. 597, 402 N.E.2d 599, 601 (1980)):

    (1) false statement of material fact (2) known or believed to be false by the party making it; (3) intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance.

Here Lind–Waldock has not shown it was damaged by reliance on Caans' statements. Rather it is damaged (if at all—it may still win its dispute with Bernstein) by its own settlement of the foreclosure for less than the full value of the collateral. No fraud is claimed to have induced that settlement. Instead both allegedly fraudulent components present a "no harm-no foul" situation.

Thus, even if the customer account agreement is assumed to have been fraudulently procured, Lind–Waldock cannot complain—because it ultimately obtained full value in the form of the Note and its underlying security. And in like fashion, even if Glenn's March 20, 1980 statement that he had insufficient resources to cover his losses is assumed to have been false, the only consequence of that falsehood was Lind–Waldock's acceptance of the mortgage on Mary's property as security for the Note. Lind–Waldock shows no harm from that, though, because it pursued that obligation to what it agreed upon as full satisfaction. In that respect, it cannot complain because *it* chose not to realize on the full value of its security.[5]

---

**5.** That choice renders it irrelevant whether the entire property was adequate security for the Note. Nevertheless, the indications are that it was. Where the unimproved five-acre portion brought $158,400 at auction, it seems likely that the entire ten-acre parcel including the home would have netted at least the full amount of the Note. Of course, Lind–Waldock does not face up directly to how it would have been entitled in any event to more than the proceeds it actually received from the foreclosure—given its prior receipt of the $220,000.

Thus the foreclosure litigation and settlement really defeat all of Lind-Waldock's claims. Nevertheless, Caans have suggested alternate bases for summary judgment that can be dealt with briefly.

### Bankruptcy Discharge

Caans also say Glenn's discharge in bankruptcy bars this action. In Glenn's schedule of liabilities filed in that proceeding (see 11 U.S.C. § 521(1)), he listed his debt to Bernstein arising out of the lease and the subsequent forced sale of Bernstein's Market seat. That debt was then discharged pursuant to 11 U.S.C. § 727. Glenn reasons that Lind-Waldock seeks to (but cannot) recover the "same" $220,000.

Lind-Waldock effectively concedes (by its silence on the subject) that to the extent it would seek to recover here in its capacity as a surety for Glenn's debt to Bernstein, the discharge of that debt would bar its present action. But Lind-Waldock asserts forcefully that it is suing instead on Caans' direct liability to it (1) under the Note and (2) for fraud. Because Glenn did not include those liabilities in his bankruptcy schedule (and because Mary has never even filed for bankruptcy), Lind-Waldock says there was no discharge (see 11 U.S.C. § 523(a)(3)).

■ That debate between the parties seems to boil down to a repeat of the prior one. If (as the preceding section has held) any direct claims by Lind-Waldock had already been settled before Glenn filed for bankruptcy, there was no debt due to Lind-Waldock for Glenn to schedule and thus seek to have discharged. Only if, on the other hand, the prior settlement of the foreclosure proceeding had not subsumed Lind-Waldock's direct claims against Caans would Lind-Waldock's argument discussed in the preceding paragraph have any force (on the ground that a debtor such as Glenn is required to schedule even con-

tingent claims to make sure they are discharged in bankruptcy). Hence Caans' bankruptcy defense is not really an independent one, but is no better and no worse than their foreclosure-suit-settlement and res judicata defenses.

### Statute of Limitations

Caans also urge the fraud counts are barred by Illinois' five-year statute of limitations (Ill.Rev.Stat. ch. 110, ¶ 13–205 [6]): Caans' alleged misrepresentations occurred on August 6, 1979 and March 20, 1980 and this action was filed April 9, 1987. Lind-Waldock retorts the five-year period was tolled by Caans' fraudulent concealment of the fact that Lind-Waldock had a cause of action against Caans. Lind-Waldock says:

1. Such fraudulent concealment tolls the statute until the prospective plaintiff discovers the cause of action (Section 13–215).

2. Lind-Waldock did not discover Caans' fraud until 1986, when Glenn applied for a trading account and disclosed assets that showed Glenn lied when he said he could not cover the original shortfall in his account.[7]

■ Two factors block the application of Section 13–215 to this case. Either would be sufficient alone, and together they are doubly so.

First, although Section 13–215 would literally seem to toll the statute until the cause of action is discovered, the Illinois Supreme Court has been more demanding of litigants seeking the protection of that provision. As *Witherell v. Weimer*, 85 Ill. 2d 146, 156, 52 Ill.Dec. 6, 11, 421 N.E.2d 869, 874 (1981) teaches:

the statute starts to run when a person knows or reasonably should know of his injury and also knows or reasonably should know that it is wrongfully caused. At that point the burden is upon the

---

**6.** Further references to this and other provisions of Chapter 110 will simply take the form "Section—" (this follows the usage in Smith-Hurd's Annotated Statutes, where "¶" is used as part of the overall statutory compilation but "§" is used within such statutes as the Code of Civil Procedure (Chapter 110)).

**7.** At least Lind-Waldock claims Glenn lied in that respect. For current purposes that claim will be accepted as correct, although this opinion does not make any finding to that effect.

injured person to inquire further as to the existence of a cause of action.

See also *Curry v. A.H. Robins Co.*, 775 F.2d 212, 215–17 (7th Cir.1985). Here there is no question that by March 1980 Lind–Waldock knew of its injury, knew it was assertedly wrongfully caused and knew who caused the injury. Yet it took no steps to ascertain whether there had been a fraud.

Second, Lind–Waldock's use of Section 13–215 is barred by the absence of any affirmative acts of concealment on Caans' part. *Zagar v. Health and Hospitals Governing Commission of Cook County*, 83 Ill.App.3d 894, 898, 39 Ill.Dec. 112, 116, 404 N.E.2d 496, 500 (1st Dist.1980) (citations omitted) put it this way:

> The concealment contemplated by this section must consist of affirmative acts or representations which are calculated to, and in fact do, prevent the discovery of the cause of action; mere silence of the defendant and failure by the plaintiff to learn of the cause are not sufficient.... Even where this standard is met, section 22 [8] does not apply if the party affected by the fraud might, with ordinary diligence, have discovered it.... [F]raudulent misrepresentations which form the basis of a cause of action do not constitute fraudulent concealment under that section in the absence of a showing they tended to conceal the cause of action.

Lind–Waldock has not shown any affirmative act of concealment by Caans, has not shown it relied to its detriment on any such act and has not shown it could not have discovered the fraudulent concealment with due diligence.

In short, Lind–Waldock has presented no evidence suggesting a factual basis for tolling the statute of limitations. Counts V and VI are thus doubly barred.

### Conclusion

There is no genuine issue of material fact. As a matter of law, Lind–Waldock

has previously litigated and settled all the claims it presses in this suit. Caans are therefore entitled to a judgment as a matter of law on all counts. In addition, Counts V and VI are barred by the statute of limitations. Caans are independently entitled to a judgment as a matter of law on those counts. This action is dismissed in its entirety.

---

**8.** [Footnote by this Court] That reference is to Ill.Rev.Stat. ch. 83, ¶ 23, the identically-worded