CORA PRUITT *et al.*, Plaintiffs-Appellants, v. DOROTHY SCHULTZ, Defendant-Appellee.

Fourth District   No. 4—92—0136

Opinion filed October 15, 1992.

David A. Tuggle, of Law Offices of Richard J. Doyle & Associates, of Danville, for appellants.

William J. Brinkman, of Thomas, Mamer & Haughey, of Champaign, and Richard C. Hayden, of Craig & Craig, of Mattoon, for appellee.

JUSTICE LUND delivered the opinion of the court:

Six of thirteen plaintiffs in the medical malpractice action appeal from a summary judgment entered against them by the circuit court of Champaign County. The trial court held that the actions were barred by the statute of limitations under section 13—212 of the Code of Civil Procedure (Code) (Ill. Rev. Stat. 1983, ch. 110, par. 13—212).

Plaintiffs contend the trial court erred in holding that section 13—212 of the Code barred their actions. Alternatively, they contend that theories of equitable estoppel and the continuous course of treatment doctrine bar defendant from raising the statute of limitations. We need only consider the first contention.

## I. BACKGROUND

Dr. Dorothy Schultz, a specialist in neurology, diagnosed the six plaintiffs as having a rare condition known as myasthenia gravis (M.G.) and treated them for a number of years until she retired in June 1982. In simple terms, M.G. is a disease characterized by great muscular weakness and progressive fatigability. Because of an excess of a certain chemical, or lack of another chemical, nerve impulses fail to induce normal muscle contractions. Over a period of time, it may well lead to death. The disease is not easily diagnosed, and the medication usually prescribed (and prescribed by Dr. Schultz) can cause M.G. symptoms in a person not having the disease. When plaintiffs sought out other physicians to continue their care, they were informed that they did not have M.G. and they should discontinue medication. Each patient experienced a marked improvement in health after halting M.G. medication. Joseph Pelszynski and Nancy Miller filed their causes of action on June 18, 1984. The other four plaintiffs were added to the suit on an amended complaint filed on December 3, 1984.

The trial court based its dismissal on statements made in plaintiffs' discovery depositions. Defendant contends that events occurred during the treatment of each patient that should have triggered an inquiry to determine whether a cause of action existed against defendant. Defendant successfully argued in the summary judgment proceedings that these suspicions were raised more than two years before the suit was filed against her and the causes therefore are barred by section 13—212 of the Code. Plaintiffs argue there is a genuine issue of

material fact as to what point in time each plaintiff learned of the injury and, therefore, the court erred in granting a motion for summary judgment. Section 13—212 of the Code read, in relevant part:

"No action for damages for injury or death against any physician *** arising out of patient care shall be brought more than 2 years after the date on which the claimant knew, or through the use of reasonable diligence should have known *** of the injury or death for which damages are sought in the action ***." Ill. Rev. Stat. 1983, ch. 110, par. 13—212.

█ The statute begins to run when plaintiff knows, or reasonably should know, of both the physical problem and also knew, or reasonably should have known, that it was wrongfully caused. (*McIntyre v. Christ Hospital* (1989), 181 Ill. App. 3d 76, 536 N.E.2d 882.) "Wrongfully caused" does not mean plaintiff must have knowledge of a specific defendant's negligent act or knowledge that an actionable wrong was committed. Rather, a person knows, or reasonably should know, an injury is "wrongfully caused" when he possesses "sufficient information concerning his injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved." (*Knox College v. Celotex Corp.* (1981), 88 Ill. 2d 407, 416, 430 N.E.2d 976, 980-81.) The plaintiff then has the burden to investigate further as to the existence of the cause of action. (*Witherell v. Weimer* (1981), 85 Ill. 2d 146, 421 N.E.2d 869.) Whether the injured person has become possessed of sufficient information concerning his or her injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved is usually a question of fact. *Knox College*, 88 Ill. 2d at 416, 430 N.E.2d at 980-81.

In ruling on a motion for summary judgment, the trial court must consider the pleadings and evidentiary matters in the record in the light most favorable to the nonmoving party and accept as true all reasonable inferences from such facts which favor the nonmovant. It is improper to grant a motion for summary judgment where the material evidentiary facts are in dispute or where, when the facts are undisputed, reasonable minds might draw different reasonable inferences from such facts. (*American States Insurance Co. v. Whitsitt* (1990), 193 Ill. App. 3d 270, 549 N.E.2d 988.) As applied to the present case, whether plaintiffs knew or reasonably should have known, both of their injuries and that they were caused by a wrongful act, are genuine issues of fact to be determined by the finder of fact, *unless* only one conclusion may be drawn from the undisputed facts. Close questions on this issue should not be decided as a matter of law,

but are best left for juries. *McIntyre,* 181 Ill. App. 3d at 81, 536 N.E.2d at 885-86.

## II. Depositions

We first examine the statements in the depositions upon which the trial court based the summary judgments.

### A. *Dorothy Pratt (Action filed December 3, 1984)*

Dorothy Pratt was treated by Dr. Schultz from 1973 until defendant's retirement in 1982. Dr. Schultz told Pratt at the outset that she should have a family doctor to take care of problems such as colds, *et cetera.* Shortly after her diagnosis of M.G., this family physician, Dr. Strzembosz, told Pratt he did not think she had M.G. When asked her reaction to this conversation, she replied, "Well, I believed her [(Dr. Schultz)]." She never sought a second opinion, and Strzembosz never recommended that she get one. Pratt saw Strzembosz once or twice a year from 1973 to 1982, and he discussed her M.G. on nearly every visit. She felt that Dr. Schultz was the expert and he was not and, therefore, believed Dr. Schultz.

Her husband also did not believe that she had M.G. and wanted her to see another doctor, but Pratt just did not want to. When asked if she felt that she was being properly treated at the time by Dr. Schultz, Pratt replied, "No, because I wasn't getting any better." As a possible result of taking the M.G. medication, Pratt began to develop ulcer problems in 1977 and was forced to go off the M.G. medication. Asked her opinion of Dr. Schultz in 1977, Pratt replied, "I didn't think too much of her to be honest with you. *** She wasn't doing me any good. *** She was guessing." Despite these comments, she claims she did not really lose faith in Dr. Schultz during that year. She felt defendant could still do her some good, but she was displeased with the progress she was making.

In 1982, after defendant retired, Pratt saw another neurologist, Dr. Rajeswaren. He examined Pratt and said he did not think she had M.G. Pratt stated that before she saw Rajeswaren, she already knew that she did not have M.G. When her ulcers acted up in 1977, she temporarily stopped M.G. medication, but did not feel noticeably better. She was hospitalized for ulcers again in November 1981 and she again stopped the medication. This time, she felt much better. When asked when she first concluded that she did not have M.G., she replied, "In about '82 when I got off of the medication and wasn't taking it anymore." Plaintiffs argue essentially that Pratt's choice to believe the specialist rather than the general practitioner was a

reasonable choice. There also appears to be a definite question as to exactly what time Pratt decided she did not have M.G. We only know it was sometime after November 1981.

### B. *Cora Pruitt (Action filed December 3, 1984)*

Cora Pruitt began treating with Dr. Schultz in April 1977, after being injured in a traffic accident. She was referred to defendant by Dr. Cuonzo, her family physician. Defendant diagnosed M.G. in 1977 and, in June 1978, a thymectomy was performed. Pruitt's husband did not like Dr. Schultz and, just prior to surgery, he sent her to Chicago for a second opinion. The Chicago doctor concluded that "he could not say" that Pruitt had M.G. He wanted to hospitalize her for a week to run tests. After this consultation, but before the tests were run, Pruitt had another appointment with defendant and told her what the other doctor had said. After discussion with Dr. Schultz, she opted to follow her advice and have the thymectomy because "Dr. Dorothy was the finest doctor in the world *** the finest woman that ever walked the face of the earth." The tests suggested by the Chicago doctor were never performed. Her condition improved after surgery as long as she avoided stress. Dr. Schultz recommended Pruitt to quit her job, go on social security, and divorce her husband.

Both before and after this surgery, Pruitt would go to her family physician, Dr. Cuonzo, for colds, *et cetera*. He told her on several occasions that he did "not for one minute believe" she was a myasthenic and gave reasons why. Although he never explicitly recommended she get another opinion, he was certain she did not have M.G. He also criticized the medication defendant was having her take. Pruitt told him that "Dr. Dorothy" was the finest doctor and reminded him that he himself had recommended her.

Pruitt continued to take M.G. medication after defendant retired, until her prescription ran out. Dr. Cuonzo refused to refill her prescriptions, except those she was taking for a heart condition. When asked if there was anytime during her treatment with defendant that she felt the M.G. treatment was not benefitting her, she replied, "I continued to get worse, but then Doctor Dorothy would help me, and I would get better. I never gave up believing that." When asked at what point she realized she did not have M.G., Pruitt replied, "Sometime after Doctor Dorothy left and I run out of medication and didn't do anything about it." When she stopped the medication, she felt 100% better.

Plaintiffs argue that the mere fact that a consulting doctor could not confirm the diagnosis is not the same as a doctor telling that

Pruitt did not have M.G. Plaintiffs argue that a genuine issue of material fact exists as to whether the consulting opinion should have placed Pruitt on notice that Dr. Schultz' treatment was inappropriate. Defendant argues that when the consulting doctor's opinion is combined with the husband's dissatisfaction with Schultz' treatment, it is reasonable to expect Pruitt to have investigated further.

### C. *Joseph Pelszynski (Action filed June 18, 1984)*

Joseph Pelszynski began treatment with defendant in 1971, when he was admitted to the hospital for headaches. At this time, defendant diagnosed Pelszynski as having M.G. and treated him until she retired in June 1982. Pelszynski was told he would be unable to work and that he should apply for social security. He did so and received benefits until 1980 or 1981, at which time he received notice that his benefits would be cut off. Social Security sent him to its own doctor for a second opinion regarding his disability. Pelszynski saw Dr. Greenfield, who apparently gave him a list of questions to answer. Defendant described it as a "paper test like add, subtract, multiply, and divide." Deposition testimony gives no indication that a medical examination was given.

Soon after, Pelszynski received notice of the termination of his benefits and complained to Dr. Schultz. She said, "Don't worry about it. They're not going to cut you off." Pelszynski appealed the cutoff in what appears to be an administrative hearing, but the judge held that if Pelszynski was able to dress himself, then he was able to work.

Defendant claims that the cutoff of benefits should have put Pelszynski on notice that he did not have M.G. Pelszynski responds persuasively that the government was merely saying that his impairment from M.G. was not so severe as to justify a rating of total disability. This conclusion is amply supported by deposition testimony, where Pelszynski indicates his feeling that social security benefits were just being given to fewer people. Pelszynski spoke to several other M.G. patients who had their benefits cut off and heard "that you really had to be dead or dying in order to get back on again. It was that bad." Pelszynski did not suspect any wrongdoing on the part of Dr. Schultz, stating explicitly that throughout the entire 10 years of treatment, he was satisfied with the medical care received from defendant.

Sometime between 1978 and 1982, Dr. Rajeswaren was treating Pelszynski's daughter in the hospital. When he learned that her father had M.G. for the last 10 years, he remarked to Pelszynski that anyone who had had it for so long would be either dead or bedfast. This doctor never reviewed Pelszynski's medical records, nor did he examine

Pelszynski. The conversation took place in a hospital hallway. Pelszynski was never asked whether this caused him to doubt Dr. Schultz' diagnosis. Although the date of this conversation is uncertain, the fact that the doctor mentioned a time period of 10 years suggests that the conversation may have occurred in 1981.

After Dr. Schultz retired, Pelszynski saw Dr. Adams in order to refill his prescription for M.G. medication. Adams refused, telling him he did not have M.G. Later, another doctor, Dr. Lantz, told Pelszynski he also did not think that he had M.G. At this point, Pelszynski quit taking the medication and began to feel a lot better. When asked at what point he first thought that he did not have M.G., he responded, "When I quit taking the medication and started feeling better."

### D. *Cloyd Miller (Action filed June 18, 1984)*

Cloyd Miller appears easily confused and to have an extremely poor memory for dates. Dr. Schultz treated him for M.G. for nine years, seeing him on an average of every two weeks. He was initially treated by his family physician, Dr. McDonald, but after being treated by defendant, she told him not to see anyone else and to come to her for everything. When he was initially diagnosed by defendant as having M.G., he told her that he was considering getting a second opinion from Dr. Tether. While she did not explicitly tell him not to go, she said that she could take care of him. The testimony seems to imply that Dr. Schultz convinced him it would be unnecessary.

In 1977, Miller had a thymectomy as part of his treatment for M.G. According to his testimony, it was shortly after this surgery that he began to think that he did not actually have M.G. When asked for the basis of this opinion, he responded:

"A. [Miller:] Things going through my mind, you know, all the medication I've taken, *** and nothing was being done, and I just got—I just got restless.

Q. [Defense attorney:] You didn't think that Doctor Schultz' treatment was benefiting you?

A. I loved her. I trusted her, but that's about the only way I can answer it. I trusted her and I loved her."

When asked again whether he thought defendant's treatment was benefiting him, he responded that he thought "she was trying her best to put me back." When asked why he did not seek a second opinion, Miller said it was because he trusted her. Miller consulted with another doctor shortly after defendant retired. He was told that he probably never had the disease, and this diagnosis was subsequently confirmed by two other specialists. Miller had been taking M.G. medi-

cation for nine years without interruption. He claims that defendant told him of another patient who was not taking his/her medication regularly, and she mentioned that someday that person would go into a coma or something on that order.

Plaintiffs argue that the mere fact that Miller experienced doubts about the diagnosis of M.G. after his surgery in 1977 is not the same as having knowledge that he was being injured by his treatment. An argument can also be made that Miller was merely despondent after an extremely painful hospital stay. This is supported by the fact that Miller continued to treat with defendant for nearly five more years. Defendant argues it is reasonable to expect Miller to have sought a second opinion after his surgery in 1977.

### E. *Mary Blaney (Action filed December 3, 1984)*

In 1980, after treating with defendant for about 10 years for M.G., Mary Blaney decided to get a second opinion at Barnes Hospital in St. Louis. Dr. Pintella told Blaney she did not think that she had M.G. and had her doubts that Blaney had ever been afflicted with the disease. She told Blaney to discontinue the M.G. medication. Blaney followed these orders, except for occasional use, when she felt "real bad" or "real weak." Blaney's general condition improved after halting the medication for M.G., but she continued to see Dr. Schultz for treatment of migraine headaches.

Sometime after her examination by Dr. Pintella, Blaney saw Dr. Tether in Indianapolis, who told her she did not have M.G. When asked at what point in time she decided that Dr. Schultz had possibly done something wrong, she replied, "After I talked to Doctor Tether and had talked to Doctor Pintella in St. Louis." Blaney saw Dr. Pintella in 1980 and Dr. Tether at sometime after seeing Pintella, but before defendant retired in June 1982. Blaney also claimed that during the course of treatment she received from defendant, she never doubted that she actually had M.G. This statement conflicts with the one above which indicated that the doubt arose during treatment. When questioned why she never discussed these opposing opinions with Dr. Schultz, she replied, "I had a lot of faith in Dr. Schultz. I mean I thought she knew what was best, and I was, I thought, well, she is the doctor. She should know."

*Defendant's brief*, at page 10, states that *Dr. Schultz* told Blaney in 1980 that she did not have M.G. This statement is mistaken; *Dr. Pintella* had so advised Blaney—not Dr. Schultz. Plaintiffs persuasively argue that it is unclear at exactly what point Blaney became aware that she might have suffered an injury due to Dr. Schultz'

treatment. The question was never asked at deposition. Without knowing precisely when she saw Dr. Tether, we can only say that she began to have doubts sometime between 1980 and June 1982. She was asked if at anytime during her course of treatment with Dr. Schultz she had doubted whether the treatment being provided was beneficial. Blaney replied that she never doubted Dr. Schultz. When asked again whether she had doubts as to whether the treatment was actually benefiting her, she responded that she hoped it was. When asked to pinpoint the time that she began to feel that Dr. Schultz had done something wrong, she replied, "Well, in the first place, I didn't want to believe I had anything wrong with me to start out with, and I just—well, I didn't accept it, and that's what she told me part of my problem was, 'Well, you just won't accept reality.' "

### F. *Linda Chandler (Action filed December 3, 1984)*

Linda Chandler appears to have a remarkably poor memory and be easily confused. An argument could be made that her deposition testimony, filled with so many gaps, contradictions, and loss of recollection, is by its nature alone insufficient to form the basis of a summary judgment.

Chandler had no recollection of when she started or finished treating with defendant. According to interrogatories she answered in 1986, an unknown physician at Barnes Hospital in St. Louis told Chandler she was not suffering from M.G. At her deposition, Chandler retracted this answer, claiming that she had meant to say that they told her that further testing would be needed before they would know for certain whether she had M.G. Chandler had no present recollection of when this occurred.

On another occasion, an unknown physician at an unknown time told Chandler that if he were Dr. Schultz, he would not "jump too quickly on this," apparently referring to the initial diagnosis of M.G. It is likely that this occurred soon after Chandler was first diagnosed, but Chandler later stated that it occurred after a couple of years of treating with Dr. Schultz.

Dr. Safman, who was in charge of the physical therapy ward at Mercy Hospital, suggested to Chandler that she might not have M.G. and further testing was needed. Chandler stated, at one point, that the conversation occurred early in her treatment, but later on stated that it happened a number of years into treatment. Also relevant is the fact that defendant treated two of Chandler's sisters-in-law for M.G. Chandler said that this made her feel as though "something was not right." No time frame was stated for this particular revelation.

At least three years into treatment, in September 1981, Dr. Schultz told Chandler that she might not have M.G. This conversation took place within a year after her visit to Barnes Hospital in St. Louis, and less than one year before defendant retired. Defendant continued to treat Chandler for lupus, until shortly before her retirement. When asked at what point she believed she had never had M.G., Chandler replied, "It was when Dr. Schultz changed her diagnosis." When asked why she did not question it earlier, she responded that "if that woman would have told me to go out and let a semi run over me and I'd feel better, I would have done it. I believed anything that woman told me." Despite being told in late 1981 that she did not have M.G., Chandler came to the conclusion that she had been harmed by defendant's treatment sometime between 1982 and 1984.

At some undetermined date, Dr. Schultz sent Chandler to Chicago for further testing but, because of a mix-up in getting records to the Chicago physician, the examination was inconclusive. When asked if she had any doubts about Dr. Schultz' diagnosis of M.G. after she returned from Chicago, she responded that she did not and that she trusted Dr. Schultz with her life.

### III. ANALYSIS

As we have said, the question of whether plaintiffs possessed sufficient information (concerning the injuries and the cause of the injuries to put a reasonable person on inquiry to determine whether actionable conduct is involved) is usually a fact question for the jury. (*Knox College*, 88 Ill. 2d at 416, 430 N.E.2d at 980-81; *Witherell*, 85 Ill. 2d at 156, 421 N.E.2d at 874.) When it is apparent from the undisputed facts, however, that only one conclusion can be drawn, the question becomes one for the court. (*Witherell*, 85 Ill. 2d at 156, 421 N.E.2d at 874; *Neaterour v. Holt* (1989), 188 Ill. App. 3d 741, 746, 544 N.E.2d 846, 850.) The complexity of the decision is accentuated by the inherent uncertainties of medical diagnosis and the faith necessarily reposed in doctors by their patients.

Both *Witherell* and *Neaterour* are somewhat instructive as to when the court should find as a matter of law that plaintiff possessed sufficient information to put a reasonable person on inquiry. Witherell suffered severe leg pains after starting birth control pills and was diagnosed by Dr. Weimer as having leg cramps. The situation worsened and continued for many years. Plaintiff was warned by her mother and others that the pills could cause blood clots, and another doctor had actually diagnosed blood clots in her legs. While equitable estoppel was found applicable, the court stated:

"[I]t is, as in *Berry*, inconceivable to us that a reasonable person would not have realized, at least by the time of plaintiff's second hospitalization in 1972, that she may not have been receiving proper diagnosis and treatment." *Witherell*, 85 Ill. 2d at 157, 421 N.E.2d at 874.

In *Neaterour*, hip surgery was performed on plaintiff in April 1981 and afterward, while still in the hospital, defendant told her that the surgery had not gone according to plan. As a result of continued pain and discomfort, she sought the opinion of two other physicians (in October 1981 and March 1982), both of whom advised her that she had not received proper treatment. Even so, she continued to treat with defendant through May 10, 1982. She filed suit in May 1984, and this court held that her cause of action was time-barred.

■ In the present case, deposition testimony establishes that defendant gave the appearance of a dedicated, caring, and capable physician. Her patients' perception of her knowledge and authority is undoubtedly amplified by her status as a specialist in neurology. Dependence and reliance on her medical advice is therefore to be expected. Our supreme court in *Witherell* placed great emphasis on the doctor-patient relationship, noting that a patient will often accept a doctor's recommendation without question. (*Witherell*, 85 Ill. 2d at 159, 421 N.E.2d at 876.) It is within this complex environment of trust and authority that a court is called upon to determine the particular moment in time that a patient should reasonably be expected to doubt his or her physician's advice.

The complexity of this determination is enhanced by the fact that medication prescribed by defendant may have created symptoms in her patients that mimic symptoms of a person afflicted with the actual disease. Realization that their physician's advice was erroneous is necessarily linked to the discontinuation of their medication. Evidence of the specific time when each patient discontinued this M.G. medication is lacking.

Regardless of the fact that some of the appealing plaintiffs saw other doctors who questioned the M.G. diagnosis, we hold that reasonable minds might draw different reasonable inferences from the facts. In this case, the determination whether, and when, the various plaintiffs possessed sufficient information as to put a reasonable person on inquiry to determine whether actionable conduct was involved is a question better left for the jury.

In remanding this case for trial, we are aware that the issue of equitable estoppel may arise. Estoppel is also ordinarily a question of fact, unless there is no dispute of material fact and only one inference

can be drawn therefrom. Then it becomes a question of law. (*Neaterour*, 188 Ill. App. 3d at 750, 544 N.E.2d at 852; *Pantle v. Industrial Comm'n* (1975), 61 Ill. 2d 365, 369, 335 N.E.2d 491, 494.) The present record is far from complete on what defendant said and did that might trigger equitable estoppel.

Reversed and remanded.

STEIGMANN and KNECHT, JJ., concur.