2025 IL App (1st) 231711-U

No. 1-23-1711

First Division
June 2, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| MARY MURPHY, individually, and as Special Administrator of the Estate of PETER MURPHY, deceased, | ) ) ) | Appeal from the Circuit Court of Cook County, Illinois |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 2020 L 9603 |
| | ) | |
| MARYANN FERNANDEZ and SOLEDAD SOCIAL SERVICES, an Illinois corporation, | ) ) | Honorable Anthony C. Swanagan |
| | ) | Judge, presiding. |
| Defendants-Appellees. | ) | |

_____

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) Circuit court's granting of defendants-appellees' motion to reconsider was not an abuse of discretion, where entry of summary judgment for defendants on the basis that plaintiff-appellant's complaint was time-barred was not in error; (2) plaintiff forfeited argument that court improperly dismissed plaintiff's second amended complaint pursuant to Illinois Supreme Court Rule 341(h)(7).

¶ 2    As the facts of this case are set forth in substantial detail later and throughout this disposition, we summarize the procedural aspects of the case here. Briefly, this case concerns the

death of Peter Murphy (Peter), a severely disabled adult. Peter resided within a Community Integrated Living Arrangement (CILA) group home operated by defendant-appellee, Soledad Social Services (Soledad). On May 29, 2018, following a brief period on life support, Peter died. On September 8, 2020, Peter's mother and plaintiff-appellant, Mary Murphy (Mary), individually and as special administrator of Peter's estate, filed a complaint for wrongful death and survival against Soledad and its executive director, Maryann Fernandez (Fernandez).[1] Following discovery and the complaint's amendment, defendants filed a motion for summary judgment, arguing that the complaint was time-barred as it had not been filed within the two-year statute of limitations required for wrongful death actions. The circuit court, with Judge Daniel Trevino presiding, denied the motion.

¶ 3      Defendants filed a motion to reconsider, and Mary also filed a motion for leave to file a second amended complaint to add a count for negligent infliction of emotional distress. Subsequently, a different assigned judge, Judge Anthony Swanagan, granted the motion to reconsider, entered summary judgment for defendants, and dismissed the second amended complaint with prejudice.

¶ 4      Now on appeal, Mary argues that the circuit court erred in granting defendants' motion to reconsider, granting the motion for summary judgment, and dismissing Mary's second amended complaint. For the reasons that follow, we affirm the decision of the circuit court.

## I. BACKGROUND

¶ 5                                A. Proceedings Prior to Litigation

---

[1]The record reflects different iterations of Fernandez's first name throughout.

¶ 6     The following facts are derived from the record on appeal, which includes various iterations of the complaint, defendants' answer, the report of proceedings, and defendants' motion for summary judgment. We note that many of the underlying facts regarding the timeline of Peter's death are disputed.

¶ 7     Soledad is an Illinois corporation, licensed and regulated by the Illinois Department of Human Services (IDHS). As a CILA group home, Soledad is designed to provide services and support to individuals with developmental disabilities. Fernandez, Soledad's executive director, was also a registered nurse.

¶ 8     Peter was born on June 20, 1987. He was diagnosed and received services for multiple disabilities, including severe intellectual disability, autistic disorder, seizure disorder, and anxiety disorder. Peter was also non-verbal. On June 10, 2016, Peter was admitted to Soledad for care and treatment.

¶ 9     In March 2018, Peter was diagnosed with testicular cancer and right hydronephrosis with atrophy of the right renal cortex, commonly known as chronic kidney disease. That month, a stent was placed in his right kidney for treatment and his right testicle was removed.

¶ 10     On April 20, 2018, Peter was admitted to La Grange Hospital for sepsis, where he received intravenous antibiotics. On April 26, 2018, he was discharged to "HCR Manor Care" in Hinsdale, Illinois, to continue receiving intravenous antibiotic therapy.

¶ 11     On May 11, 2018, Peter was discharged from Manor Care and returned to Soledad. Between May 15 and May 21, 2018, Peter left Soledad briefly to receive in-patient chemotherapy at Advocate Lutheran General Hospital (Lutheran General). After completing chemotherapy, he was released from Lutheran General and returned to Soledad on May 21, 2018.

¶ 12    On May 23, 2018, Soledad staff began noticing that Peter was barely eating or drinking, and had multiple bowel movements which resulted in watery stool. On May 24, 2018,[2] Peter had a follow-up visit with his oncologist, who advised that Peter needed to be monitored for food and liquid intake, any signs of infection, or changes in his condition.

¶ 13    On May 26, 2018, Peter's condition worsened, as he was still not eating or drinking, had vomited twice, and was reported to have at least five watery stools in his bed. That same day, Mary communicated with Soledad staff, including Fernando Jaleco, Peter's direct caregiver, and Fernandez, about Peter's condition. During these communications, Mary discovered that Fernandez was out of town. After Mary requested that Peter be taken to the hospital, Soledad arranged for Peter's transport to La Grange Hospital.

¶ 14    That evening, a Soledad employee drove Peter to La Grange Hospital. When he arrived at around 9:30 p.m., his father, Thomas Murphy, was there to meet him. Peter was laid across the back seat of the car and required a security guard, his father, and the Soledad employee to remove him. He was placed in a wheelchair and driven into the emergency room. During the transport, Peter stopped breathing and had a cardiorespiratory arrest. Emergency life support was performed with intubation, and he was resuscitated and placed on a ventilator.

¶ 15    Peter was later diagnosed with, among others, acute hypoxemic respiratory failure, metabolic acidosis, acute renal failure, and hypokalemia due to diarrhea and septic shock. He also had severe "protein-calorie malnutrition" and tested positive for MRSA. During his hospital stay, doctors determined that Peter did not have any active brain function.

---

[2]The date of this visit appears to be disputed.

¶ 16    On May 29, 2018, the family removed Peter from life-support measures and he died that same day. His death certificate listed testicular cancer, bacteremia and pancytopenia as the causes of death, with the manner of death as "natural."

¶ 17                                    1. OIG Investigation

¶ 18    On June 14, 2019, IDHS's Office of Inspector General issued a report concerning Peter's death. The report indicated that on May 29, 2018, Soledad had notified IDHS of Peter's death. IDHS then conducted a death review on November 29, 2018, which had resulted in a "full investigation" after a clinical coordinator found evidence of neglect. Multiple individuals were interviewed for the investigation, including Mary, Fernandez, Peter's caseworker, Araceli Mendoza, and various other Soledad employees.

¶ 19    The report recounted and evaluated Soledad's official policy for hospitalization and emergency measures, including that employees were trained to provide immediate treatment for individuals exhibiting medical and behavioral emergencies, such as "change of mental status," "change in vital signs," and "unresponsiveness." The report indicated that, although there was some evidence that Peter had been eating or drinking on the date of his death, he was doing so in very small quantities and was otherwise experiencing weakness, multiple bouts of diarrhea, and vomiting. It further noted that there had been a "significant time delay" in Peter receiving adequate monitoring and timely medical care for his chemo's side effects and other potential complications, which had "caused a serious deterioration" in Peter's physical and medical conditions.

¶ 20    Ultimately, the report concluded that the neglect allegations were substantiated and that it was recommended that all Soledad staff be retrained on its policy to address when "911 must be called." The report did not list any aggravating or mitigating circumstances, and otherwise found that the neglect was "not egregious."

¶ 21                    2. Initial and First Amended Complaint

¶ 22    On September 8, 2020, Mary, in her individual capacity and as special administrator for Peter's estate, filed a four-count complaint for damages in the circuit court of Cook County against Fernandez and Soledad. Counts I and II, brought against Fernandez, alleged negligence under Illinois' Wrongful Death Act, 740 ILCS 180/1, and Illinois' "Survivorship Act," 755 ILCS 5/27-6 (West 2020).[3] Counts III and IV, brought against Soledad, alleged the same.

¶ 23    On November 23, 2020, defendants filed an appearance and jury demand through counsel. Defendants subsequently filed a motion to dismiss, arguing that the complaint was untimely and outside of the two-year statute of limitations for personal injury claims. In lieu of a response, Mary requested that the court grant her leave to file an amended complaint. By agreement, defendants withdrew their motion and Mary amended the complaint.

¶ 24    On March 5, 2021, the first amended complaint was filed. The complaint remained virtually the same, with the inclusion of the following paragraph under each wrongful death count:

> "The Plaintiff, MARY MURPHY did not know, nor had she any reason to believe that any negligent acts or omissions by the Defendants in their treatment of PETER MURPHY were the proximate cause of his injury until she learned on or about November 29, 2018, of the investigation opened by [t]he Illinois Department of Human Services, Office of the Inspector General, into PETER's death."

¶ 25    On March 29, 2021, defendants filed an answer, denying most of the allegations, and asserted an affirmative defense. As for its affirmative defense, defendants alleged that the

---

[3]The specific statutory citation does not appear in the complaint. but the claims were entitled "Survival Act."

complaint was time-barred, in that Mary knew or should have known that her son had an injury that may have been wrongfully caused on the date of his death.

¶ 26    Mary responded to interrogatories during discovery. When asked about the names of any doctors who may have informed the family that defendants may have been negligent in Peter's treatment, the following response was given: "I do not recall the name of Peter's cancer doctor who informed me that his cancer was extremely curable, and his prognosis was good. Though I was unable to catch his name, one of the cardiologists who treated Peter before his death said Peter went into cardiac arrest due to his severe dehydration."

¶ 27                                3. Depositions

¶ 28    During discovery, Mary and Thomas were deposed by defendants. We recite the relevant portions of their testimony below as related to this appeal.

¶ 29                                a. Mary

¶ 30    Mary testified that Peter's disabilities prohibited him from communicating with people beyond a few words and sign language. He could communicate when he needed water and could feed himself independently. However, he could not do a variety of other daily activities. After Peter moved to Soledad, Mary would visit him once a week, and would call to check on him several times a week. Fernando was his primary caregiver, but he was not a nurse or certified nursing assistant. Although Fernando was relatively attentive to Peter's needs, he would respond to Mary's questions about Peter's condition with one or two-word answers.

¶ 31    Peter was relatively healthy until his cancer diagnosis, which had metastasized into his kidney and gallbladder. However, Peter's cancer prognosis was generally positive. It was Mary's understanding that Fernandez would check on Peter at least once a day after he completed his first round of chemo and returned to Soledad.

¶ 32    The effects of Peter's chemo began to set in after a few days. Mary called every day to see how he was. Mary had communicated to Fernando that Peter needed to be hydrated and eat because "if he doesn't get sick from the chemo, he's going to die of malnutrition." Fernando and Fernandez both told her that Peter was not eating or drinking much, but that they were taking care of him. Fernando had told her that he had tried to get Peter to drink a Gatorade and Ensure, but Peter would not do so. According to Mary, Fernando did not indicate that Peter's lack of drinking was anything serious and Mary did not perceive his tone as worrisome. She believed that Peter's difficulties may have been related to chemo.

¶ 33    Peter had an oncology follow-up appointment sometime on or around May 24. Prior to May 26, Mary told Fernando she wanted to take Peter out for the weekend. Fernando responded, "that's not possible, he's not in any shape to do that."

¶ 34    On the morning of May 26, 2018, Mary telephoned Soledad and spoke to Fernando. He indicated that he had changed Peter five times that day. Mary assumed this meant that Peter had had a bowel movement. Fernando further indicated that Peter had not been eating or drinking and was dehydrated. Mary asked if Peter needed to go to the hospital, to which Fernando responded that she should ask Fernandez. Mary felt there was "no sense of urgency" in Fernando's voice, as she otherwise "would[] [have] been really concerned."

¶ 35    Around 6 p.m. after work, Mary called Fernando again to check on Peter's condition. Fernando said he was the same, in that he had not been eating or drinking, was dehydrated, and that he had changed Peter five or six times. Fernando did not mention any bowel movement or diarrhea, and did not sound upset or have any sense of urgency. Mary again asked if Peter should go to the hospital and he responded that she should call Fernandez.

¶ 36    Mary then telephoned Fernandez to determine if Peter should go to the hospital. Fernandez responded that she did not have anyone to take him as she herself was out of town. Mary was surprised as she had been unaware that Fernandez was not there while Peter recovered from chemo.

¶ 37    Fernandez indicated that she would call for a driver and get back to her. Mary responded that her husband could meet them at the hospital. Fernandez called Mary back to tell her that she had located a driver and that Peter would be transported to La Grange Hospital. It was not the closest hospital in the area, but Mary assumed that if it had been an emergency, Peter would be brought to Lutheran General.

¶ 38    As Mary was leaving for the hospital, Thomas frantically called her and said, "He's gone, Peter's gone." When Mary arrived, Thomas told her that he had been a police officer for over 30 years and had never seen anyone look the way Peter had when he had arrived. According to Mary, Peter's cardiologist told them that Peter had suffered cardiac arrest due to severe dehydration and that Peter's death had been preventable.

¶ 39    After Peter's death, Mary spoke to Peter's caseworker, Araceli Mendoza. Mendoza indicated that the Soledad staff was upset about Peter's death and wanted to attend his memorial service in June. Mary denied their request because she believed he was gone "due to [their] neglect[.]" The family did not hear from the employees again.

¶ 40    Mary acknowledged that she had reviewed the OIG report. She was asked about a statement she made therein, which referenced a comment made to her by an oncologist. The comment was that Peter had to have been sick for several days to arrive at the hospital in the condition he had been in. She confirmed the statement was accurate. On cross-examination, Mary confirmed that the same oncologist had told her that if Peter became sick, he should be transported to a hospital closer to Soledad, such as Lutheran General.

¶ 41                                                    b. Thomas

¶ 42    Prior to May 26, Thomas had neither personal knowledge of Peter's condition nor any communications with Soledad employees prior to Peter's hospital admission. However, he recalled that Peter's care at Soledad had begun to "turn a bit" prior to his death, where Thomas felt employees did not pay Peter as much attention because he was non-verbal.

¶ 43    While staying at Manor Care to prepare for chemo, doctors had told the family that Peter needed a registered nurse to check on him once or twice a day when he returned to Soledad. This was to monitor any infections that might arise from treatment. Fernandez volunteered to do so because she was a nurse and indicated to the family that they did not need to hire an additional one. The family agreed that, as long as a nurse was monitoring Peter on a daily basis, he could return to Soledad. In hindsight, it was significant to Thomas that Fernandez had been out of town as she was supposed to be checking on Peter and was unaware if a different nurse had been assigned to monitor him.

¶ 44    Prior to May 26, Mary had told Thomas that Peter was worn out from chemo and needed a few days to rest. Mary had told him that Peter was having diarrhea and that Soledad employees kept referring to him as "not feeling well." On May 26, Mary asked him to meet Peter at La Grange Hospital as he was apparently lethargic and might need assistance getting out of the car. Peter's oncologist was located there. However, the family understood that Peter would go to another hospital if there was an emergency. He and Mary were not responsible for making those decisions.

¶ 45    Thomas waited for over an hour at the hospital and called Fernando to ask where Peter was. Fernando indicated that Soledad was trying to locate a driver. He mentioned that Peter was a "little shaky" and that the driver would need help walking him into the hospital. Nothing else was said about Peter's condition.

¶ 46    When Peter arrived, Thomas opened the car door and saw Peter collapsed on his left side. Thomas grabbed his arm to pull him up, but he was basically unconscious with no movement. A security guard helped Thomas pull Peter up and place him in a wheelchair. The driver told him that Peter had gone into cardiac arrest. Thomas was "shocked" by Peter's appearance. His eyes were rolled back into his head and when Thomas lifted his eyelids, he could barely see the bottom of his eyes. Peter's gums were "pure white" and there was a line of blood along the gum line. His breathing was labored and limited, as if he was taking a "hard breath" every twenty seconds.

¶ 47    Once Mary arrived, they spoke with the main physician who said that Peter was in critical condition. Because he was in "absolute shock," Thomas did not remember hearing from a cardiologist that said that Peter had suffered cardiac arrest due to severe dehydration. Both Thomas and Mary were shocked at the disparity between Peter's previously described condition and how he had arrived at the hospital. Thomas did not know how Peter could have ended up in that condition beyond his cancer and the contagious viral infections he had contracted.

¶ 48    Thomas was aware that his wife had asked that "certain people" not attend Peter's memorial service. He believed she had wanted to make it private for friends and family.

¶ 49                          4. Defendants' Motion for Summary Judgment

¶ 50    On January 23, 2023, defendants filed a motion for summary judgment supported by various exhibits, including the OIG report and transcripts of Mary and Thomas's depositions. Therein, defendants argued that the complaint was time-barred as it had not been filed within two years of Peter's death, citing section 180/2(d) of the Wrongful Death Act and 735 ILCS 5/13-212, the statute governing actions against certain healthcare professionals.

¶ 51    At the outset, defendants argued that there was no dispute that the complaint had been filed after the expiration of the two-year limitations period. Defendants further contended that the

discovery rule did not apply to toll the limitations period because the evidence showed that the family knew or should have known that Peter's death may have been wrongfully caused either at his death or in the days after. Defendants conceded that when a party knew or reasonably should have known of an injury and whether it was wrongfully caused would ordinarily be a question of fact. However, defendants continued, both Mary and Thomas' testimony reflected that, in multiple instances, the family knew or reasonably should have known that Peter's death may have been wrongfully caused. These instances included Mary's conversations with multiple doctors who indicated that Peter's death had been preventable or that he had to have been in that condition for several days prior to hospital admission, as well as Mary's refusal to allow Soledad staff to attend Peter's funeral based on their "neglect." Additionally, defendants argued that the circumstances of Peter's death were akin to a "sudden traumatic event" which had placed the family on notice of potential wrongful conduct, pointing to Thomas' reaction to Peter's condition upon arrival at the hospital in support.

¶ 52    In her response, Mary argued that the conflict between her complaint and defendants' motion created a question of fact. Specifically, Mary asserted that the complaint alleged that she had not possessed sufficient information that Peter's death may have been wrongfully caused until she received notice of the OIG investigation, thus implicating the discovery rule. Mary also rejected defendants' characterization of her testimony, and instead likened her various references to neglect as expressions of anger rather than actual medical knowledge, reasoning that such impressions could not rise to the level of legally sufficient information.

¶ 53    Defendants replied that the complaint's unsupported allegations were insufficient to create a question of fact when weighed against the sworn depositions in the record. Further, defendants observed, Mary could not point to any other testimony, affidavits, or documentary evidence to

otherwise create a question of fact. As such, defendants reasoned, because Mary and Thomas's testimony had not been contradicted, the testimony constituted uncontested facts as a matter of law. Finally, defendants reiterated that Illinois law did not require that Mary knew or should have known that actionable conduct was involved, but rather, only required that she possess sufficient information to be put on inquiry notice to determine if actionable conduct had occurred.

¶ 54    On May 12, 2023, following argument, the circuit court orally denied defendants' motion. The court found that there was a question of fact as to whether Peter's parents knew that his death had been wrongfully caused to toll the statute. In particular, the court perceived Mary's numerous mentions of the word "neglect" to be subject to various interpretations of Peter's condition both before and after hospital admission. The court further determined that Mary's testimony regarding various statements made to her by Peter's doctors also raised a question of fact as to what would have prevented his death and whether the death constituted a traumatic situation. Finally, the court found that the OIG report also created a question of fact, as it constituted a "credible point" where Mary knew or should have known that Peter's death had been wrongfully caused. That same day, a written order was entered denying the motion. It also granted leave for defendants to file an affirmative defense.[4]

¶ 55                                    5. Motion to Reconsider

¶ 56    Defendants filed a timely motion to reconsider.[5] Therein, defendants argued that the court had erred in its application of law in determining that there was a genuine issue of material fact regarding the tolling of the statute, despite Mary's unequivocal admissions that she had sufficient

---

[4]The record does not reflect that defendants refiled their previously filed affirmative defense.

[5]During briefing on defendants' motion to reconsider, Mary filed a motion to transfer the case back to Judge Trevino. The motion was denied on July 18, 2023.

information relating to potentially actionable conduct. First, defendants argued that the court had erred in finding a question of fact as to the word "neglect" as used by Mary. Defendants provided several definitions for the word, all which implicated a failure to provide adequate treatment. Defendants maintained that Mary's testimony aligned with these definitions, especially when considering her conversations with various physicians about Peter's condition and her refusal to allow Soledad employees to attend his funeral. Second, defendants argued that Mary's testimony qualified as a judicial admission, as she had made "deliberate statements" about "concrete facts" within her knowledge regarding her son's condition, all of which amounted to sufficient knowledge for purposes of the discovery rule. Third, defendants argued that the court erred by implicitly determining that Mary could rely on unsupported allegations within the complaint to create a question of fact against her sworn testimony to the contrary, which was otherwise uncontradicted and thus deemed admitted for purposes of the motion for summary judgment.

¶ 57    Mary responded that the motion was improper as it raised new issues not previously argued, pointing specifically to defendants' discussion of the word "neglect." Next, Mary denied that her testimony qualified as a judicial admission as it solely related to her emotions, opinions, and suspicions, which at best rose to a question of fact regarding her knowledge of the cause of Peter's death. Finally, Mary maintained that the statute of limitations had begun to run after she learned of the OIG investigation.

¶ 58    Defendants maintained the propriety of the motion, but conceded that they had not previously focused so heavily on the word "neglect." They did so in their motion for reconsideration in light of the court's legal determination that the word was ambiguous and had thus created a question of fact. Defendants additionally maintained that Mary's testimony constituted a judicial admission as to when she attained sufficient knowledge regarding Peter's

death, and that the court had erred in identifying the start of the OIG investigation as a "credible point," especially given Mary's failure to testify regarding the OIG report in her deposition beyond confirming some statements contained therein. Further, defendants pointed out other instances of perceived misstatements to the court by counsel, for which defendants sought sanctions.[6]

¶ 59     On August 24, 2023, the circuit court orally granted defendants' motion to reconsider and entered summary judgment for defendants. The court stated that there were "at least two clear-cut dates" before the OIG investigation that led it to conclude that the family knew that "something was really wrong." In particular, the court cited Mary's comment about blaming defendants for Peter's death and denying their request to attend the funeral, as well as Mary's recounting of her conversations with various doctors who told her that Peter's death might have been preventable. The court also referenced Thomas' reaction to Peter's condition when he arrived at the hospital, as well as his general dissatisfaction with Soledad's care. The court reasoned that the statute of limitations began to run "not when a plaintiff can exactly pin down a medical cause" or "when they can pin down exactly who did what," but "when they know that there is a loss that they suspect was wrongfully caused." A written order memorializing the oral ruling was entered that same day.

¶ 60     On September 22, 2023, Mary filed a timely notice of appeal pursuant to Illinois Supreme Court Rules 301 (eff. Feb. 1, 1994) and 303(a)(1) (eff. July 1, 2017).

¶ 61                                    II. ANALYSIS

¶ 62                                 A. Standard of Review

¶ 63     The parties dispute the standard of review for a motion to reconsider, the procedural posture in which this appeal arises. Mary argues that the standard is *de novo*, while defendants contend

---

[6]The request for sanctions was later orally withdrawn on August 24, 2023.

that it is abuse of discretion. We agree with defendants. "The purpose of a motion to reconsider is to bring to the court's attention newly discovered evidence that was not available at the time of the original hearing, changes in existing law, or errors in the court's application of the law." *Evanston Insurance Co. v. Riseborough*, 2014 IL 114271, ¶ 36. "A ruling on a motion to reconsider is within the sound discretion of the [circuit] court and will not be disturbed absent an abuse of discretion." *Robidoux v. Oliphant*, 201 Ill. 2d 324, 347 (2002).

¶ 64     In this case, the court's grant of the motion to reconsider resulted in the granting of the motion for summary judgment. The parties agree that the standard there is *de novo.* "Summary judgment is appropriate where the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2020). "The purpose of summary judgment is not to try a question of fact, but to determine if one exists." *Oliphant*, 201 Ill. 2d at 335. Although summary judgment is a "drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt," "[m]ere speculation, conjecture, or guess is insufficient to withstand [it.]" *Cole v. Paper Street Group, LLC*, 2018 IL App (1st) 180474, ¶ 40.

¶ 65     The circuit court reviews such submissions in the light most favorable to the nonmoving party. *Id.* The party moving for summary judgment bears the initial burden of proof, which may be met by affirmatively showing that some element of the case must be resolved in its favor or by establishing that there is an absence of evidence to support the nonmoving party's case. *Id.* ¶ 41. If that burden is met, the burden then shifts to the non-moving party, who, although not required to prove their case, must still present a factual basis that would entitle them to judgment. *Oliphant*, 201 Ill. 2d at 335. Notably, the non-movant cannot rest on its pleading if the movant has supplied

uncontradicted facts that warrant judgment for the movant, as unsupported conclusions, opinions, or speculation is insufficient to raise a genuine issue of material fact. (Internal citations omitted.) *Valfer v. Evanston Northwestern Healthcare*, 2016 IL 119220, ¶ 20.

¶ 66   Granting summary judgment on statute of limitation grounds is appropriate. *Hoffman v. Orthopedic Systems, Inc.*, 327 Ill. App. 3d 1004, 1008 (2002). We may affirm the judgment on any basis supported by the record. *Tuna v. Wiser*, 2023 IL App (1st) 211327, ¶ 55.

¶ 67                                    B. Arguments

¶ 68                    1. The Wrongful Death Act and Survivorship Acts

¶ 69   Before assessing the merits of the appeal, we first provide some discussion on the causes of action underlying the operative complaint and the various underlying legal doctrines. The Wrongful Death Act (740 ILCS 180/1) (West 2020)) allows for recovery of damages based on the loss of the deceased caused by a wrongful act, neglect, or default. *Beetle v. Wal-Mart Associates, Inc.*, 326 Ill. App. 3d 528, 532 (2001). A wrongful death action is brought by the personal representative of the decedent who may maintain any statutory or common-law actions accrued to the decedent before he or she died. *Moon v. Rhode*, 2016 IL 119572, ¶ 18. The Survival Act (755 ILCS 5/27-6) (West 2020)) is a derivative action that allows a decedent's survivors to recover damages for injuries suffered by the decedent prior to death. *Id.*

¶ 70   The issue on appeal concerns the statute of limitations for either action. "Statutes of limitations rest upon the premise that the right to be free of stale claims in time comes to prevail over the right to prosecute them." (Internal quotations and citation omitted.) *Golla v. General Motors Corp.*, 167 Ill. 2d 353, 369-70 (1995). "A limitations period encourages claimants to investigate and pursue causes of action and thereby discourages delay in the bringing of claims." (Internal citation omitted.) *Id.* at 370. Survival actions must be brought within one year. 735 ILCS

5/13-209(a) (West 2020); *Turcios v. DeBruler Co.*, 2015 IL 117962, ¶ 17. In contrast, a wrongful death action does not accrue until death, but must be brought within two years' time. 740 ILCS 180/2(d) (West 2020); *Turcios*, 2015 IL 117962, ¶ 17.

¶ 71                    2. Discovery Rule and Traumatic Injury Rule

¶ 72     The parties agree that a strict application of the statute of limitations would render the filing of the operative complaint as untimely, as Peter died on May 29, 2018, and the complaint was filed more than two years after. Thus, the dispute is whether, according to Mary, the statute of limitations was tolled until the date the family learned of the OIG investigation into Peter's death, which began on November 29, 2018. Accordingly, Mary's argument necessitates invocation of the discovery rule.

¶ 73     Generally, a cause of action for personal injuries accrues when the plaintiff suffers injuries. *Golla*, 167 Ill. 2d at 360. Traditionally, a plaintiff could not toll a limitations period by claiming they were unaware the injury existed. *Id.* "Thus, the mechanical application of the statute of limitations could, in some situations, bar plaintiffs from bringing a suit before the plaintiff is even aware that he [or she] was injured." *Id.* To combat this, the judiciary created the discovery rule, which was designed to "alleviate the harsh consequences that would flow from literal application of the limitations period[.]" *Id.* Thus, "[t]he application of the discovery rule postpones the commencement of the relevant statute of limitations until an injured party knows or reasonably should have known that he [or she] has been injured and that his [or her] injury was wrongfully caused." *Beetle*, 326 Ill. App. 3d at 536.

¶ 74     The discovery rule has been applied to a wide variety of actions. See *Knox College v. Celotex Corp.*, 88 Ill. 2d 407 (1981) (applying rule to tortious misrepresentation and fraud); *Witherell v. Weimer*, 85 Ill. 2d 146 (1981) (applying rule to strict liability action for personal

- 18 -

injuries); *Jackson Jordan, Inc. v. Leydig, Voit & Mayer*, 158 Ill. 2d 240 (1994) (application to legal malpractice claim). Relevant here, the rule has also been applied to medical negligence actions (*Moon*, 2016 IL 119572, ¶¶ 28-29), as well as wrongful death actions. See *Beetle*, 326 Ill. App. 3d at 533-36. However, generally, the discovery rule is applied on a case-by-case basis, where it weighs the relative hardships of applying the rule to both plaintiffs and defendants. *Hermitage Corp. v. Contractors Adjustment Co.*, 166 Ill. 2d 72, 78 (1995).

¶ 75    When the discovery rule is applied to a wrongful death action, knowledge of the death does not commence the statute of limitations. *Young v. McKieuge*, 303 Ill. App. 3d 380, 387 (1999). Rather, the limitations period begins to run when plaintiff knows or should have known not only of the death, but also that the death was wrongfully caused. *Id.* This is defined as "the point in time in which 'the injured person becomes possessed of sufficient information concerning his [or her] injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved." *Beetle*, 326 Ill. App. 3d at 536 (quoting *Knox College*, 88 Ill. 2d at 416). At that point, the burden falls on the injured person to inquire further as to whether there is an appropriate cause of action. *Weimer*, 85 Ill. 2d at 156. "There is no requirement that a plaintiff must discover the full extent of his or her injuries before the statute begins to run." (Internal citation omitted.) *Hoffman*, 327 Ill. App. 3d at 1010. However, when a plaintiff invokes the discovery rule, the plaintiff has the burden to prove the date of discovery. *Hermitage Corp.*, 166 Ill. 2d at 85.

¶ 76    To perhaps offset the implications of applying the discovery rule, courts have also developed the "sudden, traumatic event" analysis. See *Pszenny v. General Electric Co.*, 132 Ill. App. 3d 964, 966 (1985) ("The classification of an injury as 'traumatic' or 'nontraumatic' merely aids in the determination of when the plaintiff discovered, or should have discovered, that the injury was caused by the wrongful conduct of a defendant; the more obvious the injury[,] the more

easily a plaintiff should be able to determine its cause.") (Internal citation omitted.) Our supreme court has stated that, where an individual's injuries are caused by a sudden traumatic event, the cause of action accrues and the statute of limitations begins to run on the date the injury occurred. See *Golla*, 167 Ill. 2d at 362. Its rationale is that the nature and circumstances surrounding the traumatic event may be so great that the injured party is immediately put on notice that actionable conduct might be involved. *Id.* at 363.

¶ 77    With these principles in mind, we now turn to the merits of the appeal.

¶ 78                                3. Motion to Reconsider

¶ 79    Mary first argues that the circuit court improperly granted the motion to reconsider on a procedural basis, namely that defendants had failed to show or identify any error in the law stemming from the initial ruling. Notably, Mary cites only one case, *Jackson v. TLC Associates, Inc.*, 185 Ill. 2d 418 (1998), for the general proposition that summary judgment is not appropriate if there is a dispute regarding a material issue of fact, in support of her contention. Defendants respond that the motion was proper where it challenged the court's reliance on unsupported allegations over Mary's sworn deposition testimony to find a question of fact, and where Mary had failed to present any evidence in the record showing that the discovery rule could be invoked to toll the statute.

¶ 80    We first observe that, other than her single case citation, Mary failed to support her contention and it is thus otherwise underdeveloped. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2010) (argument shall contain citations to authorities and the pages of the record relied upon); *23-25 Bldg. Partnership v. Testa Produce, Inc.*, 381 Ill. App. 3d 751, 755 (2008) ("[R]eviewing court is entitled to have the issues on appeal clearly defined with pertinent authority cited and a cohesive legal argument presented," as the "appellate court is not a depository in which the appellant may

dump the burden of argument and research."); *International Union of Operating Engineers Local 965 v. Illinois Labor Relations Board, State Panel*, 2015 IL App (4th) 140352, ¶ 20 (a party forfeits review of an issue by failing to support its argument with citation of authorities). Even if not forfeited, we would agree with defendants that the circuit court did not procedurally err in granting the motion as it properly argued a misapplication of the law. Accordingly, we find no abuse of discretion on this basis.

¶ 81                                    4. Motion for Summary Judgment

¶ 82     Turning to the merits of the motion for summary judgment, Mary maintains that there were issues of fact as to whether the action was timely filed, based on when she knew or reasonably should have known that Peter's death may have been wrongfully caused. Mary posits three major contentions in support. First, Mary reiterates that it was sufficient to rely on her complaint's allegations to show that there was a question of fact as to when she had sufficiently been made aware of the circumstances regarding Peter's death, citing *Malone v. American Cyanamid Co.*, 271 Ill. App. 3d 843 (1995), in support. Defendants maintain that Mary could not rely on the unsupported allegations of her complaint to create a question of fact, and that ultimately it was still her burden to show that the discovery rule applied.

¶ 83     It is true that a court may consider the parties' pleadings when resolving a motion for summary judgment. See 735 ILCS 5/2-1005(c). However, Illinois law is clear that conclusions that are unsupported by admissible facts in evidence do not create a genuine issue of material fact, especially when affidavits and depositions in support of a motion for summary judgment contain facts to the contrary. See *Lesnik v. Estate of Lesnik*, 82 Ill. App. 3d 1102, 1106 (1980); *Baird & Warner, Inc. v. Stuparits*, 53 Ill. App. 3d 338, 342-43 (1977). Thus, "[a]ny factual dispute must be established by affidavits or deposition testimony of evidentiary facts which support the position of

the opposing party." *Phillips v. United States Waco Corp.*, 163 Ill. App. 3d 410, 416 (1987). Accordingly, "[a] party defending against summary judgment is not entitled to rely on the allegations in their pleading to raise a genuine issue of material fact, but must affirmatively controvert evidence adduced by the moving party." *CitiMortgage v. Bukowski*, 2015 IL App (1st) 140780, ¶ 19; *Daniels v. Weiss*, 17 Ill. App. 3d 294, 300 (1974) ("naked" allegations by the pleader do not control the outcome of a motion for summary judgment). Thus, we find Mary's argument to be without merit.

¶ 84    As her second contention, Mary maintains that there was a question of fact as to whether the discovery rule applied because she did not learn until the issued OIG report that defendants' neglect, and not her own request to transfer her son to a hospital further away in distance, may have been the cause of her son's death, an argument that we observe to be slightly different from the one raised below.

¶ 85    Defendants reiterate that they provided unrebutted evidence through Mary's own testimony that established the family's sufficient knowledge to inquire further as to the circumstances of Peter's death, beginning from his deteriorating condition at Soledad following chemo to the planning of his funeral. As an alternative, defendants also reassert the "traumatic injury" analysis, arguing that Peter's condition following a dehydration-induced cardiac arrest constituted a traumatic injury, and thus again imparted constructive knowledge to the family that his death may have been wrongfully caused.

¶ 86    We begin with the premise that, in many cases involving the tolling of a statute of limitations, the time at which an injured party knows or reasonably should have known of an injury and that it was wrongfully caused is generally a question of fact. *Weimer*, 85 Ill. 2d at 156. However, when it is apparent from the undisputed facts that only one conclusion can be drawn,

such a question can be resolved on the law. *Bradtke v. Reotutar*, 214 Ill. App. 3d 611, 614 (1991). In reviewing the record, we find no error in the circuit court's grant of the motion as we do not find any questions of fact as to when the family knew or reasonably should have had sufficient knowledge as to possible wrongful conduct contributing to Peter's death. Instead, the undisputed facts in the record, mainly derived from the family's deposition testimony, reflect that the family had attributed Peter's death to his care at Soledad. See *Conley v. Springfield Clinic*, 130 Ill. App. 3d 369, 370-71 (1985) (plaintiff's undisputed deposition testimony demonstrated objective knowledge of wrongfully caused injury).

¶ 87     We first acknowledge that Peter had been undergoing chemo, which could reasonably manifest in some kind of physical reaction on its own without any negligent causes. See *Lebrecht v. Tuli*, 130 Ill. App. 3d 457, 487 (1985) (Internal citations omitted.) Thus, in certain circumstances, it can be true that the injury's existence or wrongful cause may not be immediately known. *Id.* However, here the record reflects that the conditions that ultimately led to Peter's death were likely not so unknown. Both Mary and Thomas testified that they had been advised by Peter's oncologist that he needed to be monitored by Soledad staff upon his return for any issues with eating, drinking, or infection. Thomas had already been wary of Peter's care at Soledad prior to treatment, and the family had agreed to allow Peter to return to Soledad after Fernandez volunteered to monitor him. Within days of Peter returning, Mary was told by at least two Soledad employees that Peter was struggling to eat and drink, that he had been refusing attempts by staff to assist him, and was suffering from incontinence. Thus, even if Mary had not identified anything troubling in the employees' tone regarding Peter's condition, she had already been informed that Peter's care was not in alignment in accordance with his oncologist's instructions or that his health was taking a turn. These circumstances continued until the date of Peter's hospital admission,

where Mary had been informed multiple times that Peter was dehydrated and was suffering from incontinence. *Contra Moon*, 2016 IL 119572, ¶ 51 (question of fact existed as to wrongful conduct where plaintiff's testimony was that his mother had been "fairly old," that she was "doing okay," but perhaps should have gotten better treatment.)

¶ 88     Next, when Peter arrived at the hospital, the record reflects that Thomas had been shocked at Peter's appearance, despite his decades-long career as a police officer. Mary also had conversations with at least two doctors, one who told her that Peter's condition had been preventable given that he had gone into cardiac arrest due to severe dehydration, and another who told her that Peter had to have been in that condition for several days in order to arrive as he had. See *Hoffman*, 327 Ill. App. 3d at 1010 (plaintiff had sufficient knowledge of wrongful cause in part based on her own reported conversations with medical personnel). Admittedly, these were not expert opinions, nor does the record reflect any formal reports from such doctors. Nevertheless, when taking into account Peter's family's concerns about his condition prior to his arrival at the hospital, as well as Mary's conversations with Soledad staff, a reasonable person would have been put on notice that actionable conduct may have been involved. *Contra Pszenny*, 132 Ill. App. 3d at 968 (question of fact existed where plaintiff's symptoms after being in the hospital were not "markedly different" from the symptoms underlying her pre-existing condition).

¶ 89     Last, about a week or so after Peter's death, Mary denied a request for Soledad employees to attend Peter's funeral because, according to her, he was gone "due to [their] neglect." It is true that Thomas' testimony was that Mary may have wanted to keep the funeral private, but the record reflects no further contact with Soledad employees who had cared for Peter for at least two years. Moreover, Mary denied the request after learning from Peter's doctors that his death was due in

part to severe dehydration and infection, for which Soledad employees had been responsible for monitoring.

¶ 90    As her third and final contention regarding notice, Mary argues that her deposition testimony used to support defendants' motion only established her subjective feelings about the event, which were insufficient to trigger the statute of limitations. It is true that some courts have held that a plaintiff's subjective concerns about quality of care may be relevant to application of the discovery rule. See *Hill v. Pedapati*, 326 Ill. App. 3d 58, 64 (2001) (collecting cases). However, Mary's uncontroverted testimony reflects more than just her feelings. The testimony recounted her daily conversations with Soledad staff about Peter's failure to eat and drink, as well as her communications with doctors about how his severe dehydration had contributed to his condition. Even if her decision to deny Soledad employees funeral visitation had been based solely on emotion or an intention to keep the funeral private, we cannot ignore her choice of words that ultimately relate back to her knowledge regarding Peter's care prior to his death. See *Mitsias v. I-Flow Corporation*, 2011 IL App (1st) 101126, ¶ 24 (knowledge of wrongful cause does not require knowledge that defendant's conduct fits the "technical legal definition of negligence," but rather, that the plaintiff knew or should be aware of some possible fault by defendant).

¶ 91    In sum, we find nothing, either in Mary's direct or cross-examination testimony, that aids her contention that the statute was tolled until the OIG investigation began. Even on defendants' motion for summary judgment, a plaintiff invoking the discovery rule must still meet their own burden in demonstrating that the rule applies. See *Hermitage Corp.*, 166 Ill. 2d at 85. Moreover, by seeking to have the statute tolled when Mary purportedly learned of the investigation, Mary essentially asks us to sanction the tolling of a statute until a given plaintiff perceives themselves to be "seriously injured." In doing so, we would "eliminate[] the statute of limitations as a viable

defense and undermine[]" its purpose. *Golla*, 167 Ill. 2d at 369. More specifically, we would "encourage[] injured claimants to adopt a 'wait and see' strategy" to "defer filing lawsuits until the full extent of their injuries becomes apparent." *Id.* at 370; see also *Nolan v. Johns-Manville Asbestos*, 85 Ill. 2d 161, 170-71 (1981) (observing that if knowledge of legally negligent conduct were the standard, "a party could wait to bring an action far beyond a reasonable time when sufficient notice has been received of a possible invasion of one's legally protected interests.") The delaying of such claims "almost certainly prejudice[s] defendants[] who must defend against claims arising out of traumatic events long after witnesses' memories have faded and evidence has become unavailable for inspection and testing." *Golla*, 167 Ill. 2d at 370. Further, "[a]llowing the plaintiff's subjective assessment of the severity of an injury to control when the limitations period commences also creates uncertainty and doubt, where the legislature intended to promote predictability and finality." *Id.*

¶ 92    Based upon our review, there was no question of fact as to whether the family had sufficient notice of potential wrongful conduct involved in Peter's death at or immediately near the time of his passing. Accordingly, the discovery rule was not available to toll the running of the statute of limitations and the court did not err in its ruling. Given our holding, we need not address defendant's alternative arguments concerning the "traumatic injury."

¶ 93                    5. Dismissal of Second Amended Complaint

¶ 94    Mary argues that the circuit court's dismissal of the second amended complaint was in error, given that there was no answer on file at the time and that Mary had amended the complaint to include a claim for negligent infliction of emotional distress. Defendants respond that this argument is forfeited, in that it violates Illinois Supreme Court Rule 341(h)(7) for failing to cite any authority, and that the argument was never raised before the circuit court. Moreover,

defendants continue, even if the argument was not forfeited, dismissal was still proper because the addition of a new count did not change the fact that the complaint was still time-barred. In reply, Mary contends that she never had the chance to present any further argument on the complaint's dismissal and that we may still review to ensure a just result.

¶ 95    We agree with defendants that this argument is forfeited. A review of Mary's brief shows no citation to any legal authority or to the record in support, and therefore the argument is underdeveloped in violation of our supreme court rules. See Ill. S. Ct. R. 341(h)(7). Defendants are also correct that the record does not reflect that Mary filed a motion to reconsider the dismissal of the second amended complaint, despite arguing here that she had "no opportunity" to present any argument. See *Houdrich v. Howmedica*, 169 Ill. 2d 525, 536 (1996) (issues not raised in the trial court may not be raised for the first time on appeal and are therefore forfeited). Finally, even if not forfeited, we also agree that the added count would not have survived defendants' motion for summary judgment on the same basis of also being time-barred.

¶ 96    Notwithstanding the unfortunate circumstances in this case, we are constrained to follow the law. Based on the record before us, we find no error in the circuit court's ruling either on the defendant's motion for reconsideration or for summary judgment. As such, we affirm all orders in their entirety.

¶ 97                                         III. CONCLUSION

¶ 98    For the reasons stated, we affirm the judgment of the circuit court.

¶ 99    Affirmed.